THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH PEZUTTO *et al.* Plaintiffs in Error.

*Opinion filed October 26, 1912.*

1. CRIMINAL LAW—*State is not bound by mere. hearsay testimony of the deceased.* In a murder trial, declarations of the deceased several days before the killing cannot be used by the accused except by way of impeachment, as the State is not bound by the mere hearsay testimony of the deceased.

2. SAME—*accused may prove any fact tending to show that another person committed the crime.* In a murder trial, where the evidence is entirely circumstantial, the accused may prove any fact or circumstance tending to show that the crime was committed by another person, but if the offered evidence is too remote in point of time it is not reversible error to deny it admission.

3. SAME—*when giving instruction is error.* Where the evidence in a murder trial is wholly circumstantial, and there is no evidence as to where the defendants were at the time of the crime except their own testimony that they were at other places than the scene of the crime, it is error to give an instruction which is open to the criticism that it assumes defendants were present at the killing and were the two men who were seen running away.

4. SAME—*if facts are disputed, instructions should not assume their existence.* In a criminal case, where the facts are controverted and the evidence is conflicting, it is error for the trial court to instruct the jury that certain of the controverted facts are true.

5. SAME—*the instructions must be substantially accurate if the evidence of guilt is doubtful.* Where the evidence of guilt is not such that all honest minds must reach the same conclusion, the accused is entitled to have the evidence passed upon by a jury which has been instructed with substantial accuracy, and error in the instructions may in such case be ground for reversal.

6. SAME—*defendants are entitled to have their explanations of their whereabouts considered by jury.* In a murder trial, where

the evidence is entirely circumstantial, the defendants are entitled to have their explanations of their whereabouts on the night of the crime considered by the jury for what they are worth, even though they may not be very satisfactory.

7. SAME—*what may be ground for a new trial.* Affidavits of witnesses that they were mistaken in testifying that the house of ill-fame where one defendant testified he stayed on the night of the killing was closed up at that time, may, under the circumstances, be ground for granting a new trial.

WRIT OF ERROR to the Circuit Court of LaSalle county; the Hon. EDGAR ELDREDGE, Judge, presiding.

H. M. KELLY, and S. P. HALL, for plaintiffs in error.

W. H. STEAD, Attorney General, and CHARLES S. CULLEN, State's Attorney, (JUNE C. SMITH, and HAROLD L. RICHOLSON, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiffs in error and one Sam Mascarella were indicted, jointly, in the circuit court of LaSalle county, for murder. Mascarella gave bail and left the State and was not tried with plaintiffs in error. They were found guilty by the jury, who fixed their punishment in the penitentiary at fourteen years. This writ of error was then sued out.

The murder of Joseph Rinardo, for which plaintiffs in error and Mascarella were indicted, was committed in the night of December 13, 1910, in the city of LaSalle, Illinois, by means of three bullets from a 38-caliber revolver. The deceased and plaintiffs in error were Italians and are frequently called in the record Sicilians. They all resided in LaSalle and were well acquainted, having met often in saloons and other places after their day's work and on Sundays and holidays. No witness testified as to being near enough to identify the murderers when the shooting was done, and the evidence is all circumstantial. The testimony tends to show that the deceased, shortly after eight

o'clock on the night in question, went to the home of his uncle, Joseph Saparto, a short distance from his boarding place, in LaSalle, and found the family eating supper, Anton Peruno, one of the plaintiffs in error, who boarded with Saparto, being at the table with the rest; that shortly after Rinardo came in, Peruno rose and left the room; that the deceased, seeing the meal in progress, called for a few minutes on a neighbor, named Mike Vaccaro, but soon returned, Vaccaro and his wife coming in with him or very shortly thereafter; that while they were all at Saparto's house, Joe Pezutto, the other plaintiff in error, called and went up-stairs to see one Joe Juingo, who was boarding at Saparto's, and asked if he would take his guitar and go to Pezutto's house for a little fun; that on Juingo refusing because his clothes were wet, Pezutto came down-stairs, said good night to all and went out. Mrs. Vaccaro testified that Pezutto, as he passed Rinardo, gave him a "cross" look. On cross-examination, however, she testified that the angry look on Pezutto's face was when he said good night to all; that it seemed to her an angry look. The Vaccaros went home soon after, and Rinardo left the house about five or ten minutes after they had gone. Within five minutes after, the Sapartos and Vaccaros heard three shots fired in close succession, and heard Rinardo exclaim in Italian, "Oh, mother!" or "Mother of mine!" This shooting took place within three hundred or four hundred feet of Saparto's house. A witness who heard the shots saw two men running north from where Rinardo was, saw him stagger and fall and heard him cry out, but the witness was so situated that he could not see the faces or recognize the men who were running. Saparto and other witnesses were soon at the place of the shooting and carried Rinardo to Saparto's house. The death apparently took place almost immediately after the shots were fired. Neither of the plaintiffs in error could be found in LaSalle that night after the shooting. Pezutto was arrested several months

later in Chicago, and Peruno, after four or five days' absence from LaSalle, returned and was put under arrest. Mascarella was arrested the same night at his boarding house. The shooting took place a few minutes after nine o'clock, the time, and the intervals between the main incidents, being variously stated by different witnesses. Peruno and Pezutto were in Henry Allen's saloon, a few blocks from the shooting, shortly before the shots were fired. Allen testified that they left the saloon separately, some time between half-past eight and nine. It was testified that two days before the shooting Rinardo and Mascarella had some trouble in Allen's saloon and began to fight, but were separated; that Mascarella had a 38-caliber revolver, which was taken from him at that time by plaintiff in error Peruno.

Peruno testified that on the day of the homicide he quit work in the mines about 3:30, ate his supper about 6:30 at Saparto's, and left about a half hour later for Henry Allen's saloon; that he was not at Saparto's house that night at the time Rinardo came and did not see him; that after playing pool for a time he left the saloon about nine o'clock and went to Main street, where he took a car to Seneca; that he spent the remainder of the night in a box-car there and took the early train to Kankakee, where he visited a friend in the hospital, who had written asking him to come; that he had lost this friend's letter; that no car left LaSalle for Seneca in the morning early enough to connect with the Kankakee train; that he remained at Kankakee about five days and returned to LaSalle the following Sunday and was arrested; that he had never had any trouble before in LaSalle and that he and Rinardo were always friends and that he did not shoot him or see him that evening.

Pezutto testified that on the night in question, after he had visited Juingo at Saparto's house, he went to a saloon and drank some beer and played pool and then took a car

to Spring Valley, where he stayed all night over a saloon, in a house of ill-fame; that he went to Chicago the next day in response to a letter from the father of the girl he intended to marry; that he had destroyed this letter; that at the time he went to Chicago he did not know Rinardo had been shot, but received a letter in the latter city from his brother in LaSalle telling him of that fact and that Saparto thought that he (Pezutto) knew who did the shooting and advising him to remain away until the right man was caught; that for this reason he did not go back to LaSalle. The brother of the girl Pezutto was to marry corroborated his testimony as to Pezutto being asked to come to Chicago and as to his receiving a letter from his brother while there. When arrested he gave the name of Joe Winch, but in his testimony he stated in explanation of this that he had formerly gone by the various names of Joe Winch, Joe Pezutto and Joe Minanco. The officer who arrested Pezutto testified that he stated he had never been in LaSalle, but when confronted with his picture admitted he had formerly been there; that when told he was wanted for shooting a man in that city, he said the only shooting he knew anything about was some shots fired in a boarding house.

In rebuttal several witnesses testified that the house of ill-fame in which Pezutto testified he stopped had been closed up and was not running on December 13. On a motion for new trial affidavits of some of these witnesses were produced, stating that they were mistaken as to the date and that the house was running on the date in question. Peruno's testimony that he went from LaSalle to Seneca on a car with a certain number was contradicted by one of the road's employees, to the effect that there was no car of that number on the road. The city marshal of Kankakee was not able to find that a patient of the name given by Peruno had been in the hospital at Kankakee. The State also offered testimony showing that when Pezutto

left LaSalle the mining company owed him $41.31, which he never attempted to collect. Teresa, who ran the boarding house where Pezutto and Mascarella boarded at the time of the homicide, attached these wages after Pezutto left. Teresa moved from LaSalle shortly after the shooting and did not testify at the trial.

Several witnesses were introduced as to the good reputation of plaintiffs in error, and it was testified that the deceased and plaintiffs in error had always been friendly towards each other and had never had any trouble; that Rinardo and Pezutto lived in the same place in the old country and had been acquainted ever since they were boys. There was no testimony tending to show any motive for either of plaintiffs in error committing the homicide. The theory of the State is that the killing had been previously planned by the plaintiffs in error and perhaps by some others; that because of this plan Peruno left Saparto's house shortly after Rinardo came in that evening; that Pezutto came there with an excuse that he wanted to see Juingo, for the purpose of finding if Rinardo was still there, and that their guilt is shown by the fact that both left LaSalle immediately after the shooting; that their statements as to why they left and the contradictory stories they told are so unreasonable as to justify the verdict of the jury. Counsel for plaintiffs in error contend that the evidence, at the most, could only arouse suspicion and does not sustain the verdict; that the flight of a person suspected of crime is not evidence of guilt but only evidence tending to prove guilt; (*Fox* v. *People,* 95 Ill. 71;) that it raises no presumption of law that he is guilty, but is only a fact which may be considered by the jury, in connection with the other circumstances, in deciding upon the guilt or innocence of the accused. (2 Wharton on Crim. Evidence,—10th ed.—sec. 923; 12 Cyc. 395, and cases cited.) As we have reached the conclusion that the case

must be reversed for errors committed on the trial we shall not discuss the weight of the evidence.

It is contended that the court erred in refusing to permit testimony that Rinardo had said, shortly before his death, that Mascarella would have shot him during the quarrel two days before if the revolver had not been taken away. Evidence is admissible which is relevant and "tends to establish the issue or constitutes a link in the chain of proof." (*Commonwealth* v. *Abbott,* 130 Mass. 472; *People* v. *Gray,* 251 Ill. 431.) The statements or admissions of third parties are hearsay, and, as a general rule, not admissible. The admission of the injured person cannot be used by the accused, except by way of impeachment, where the defendant is on trial charged with the commission of crime, for the State is not bound by the mere hearsay testimony of the injured party. Gillett on Indirect and Collateral Evidence, 286; 21 Cyc. 903, and cases cited.

Counsel for plaintiffs in error also offered to prove that the deceased had trouble, several months before, with Mascarella and difficulty with his boarding-house keeper not long before the homicide. The court refused to admit the first offer and limited the last to the mere fact that there had been trouble, without permitting the details to be proved. One accused of crime may prove any fact or circumstance tending to show that the crime was committed by another person than himself. (*Synon* v. *People,* 188 Ill. 609.) It is difficult, in dealing with this description of evidence, to define the precise limits which must control its admission. It may be so remote in point of time as to be immaterial. "To a great extent it must be left to the presiding judge to determine, upon the facts before him, how far evidence of this description may have a tendency to throw light on the fact to be found." (*Commonwealth* v. *Abbott, supra,* p. 474. See, as bearing on this subject, Underhill on Crim. Evidence,—2d ed.—sec. 332, and cases cited; 2 Wharton on Crim. Evidence,—

10th ed.—sec. 913, and cases cited; *Blocker* v. *State*, 131 Am. St. Rep. [Tex.] 772, and note.) The court did not commit reversible error in its rulings on the admission and exclusion of evidence on this subject.

The court gave the following instruction for the People:

"The court instructs the jury that you should consider the conduct of the defendants at the time of the alleged killing of Rinardo and their conduct immediately afterwards, and if the jury believe, from the evidence, beyond a reasonable doubt, that they left the county of LaSalle immediately after the killing to avoid arrest, you should take that fact into consideration in determining the guilt or innocence of the defendants."

There was no evidence given on the trial as to where the plaintiffs in error were or what they were doing at the time the homicide took place, except their own evidence that they were elsewhere. This instruction assumes that the testimony shows what they were doing at that time and instructs the jury to consider their conduct then, and the jury might naturally have understood that the court thought the plaintiffs in error were present at the killing and were the two men seen running away. When the facts are controverted and the evidence is conflicting it is error for the trial court to instruct the jury that certain facts are true. (*People* v. *Feinberg*, 237 Ill. 348.) The question as to where plaintiffs in error were at the time of the homicide was a vital one. It is impossible to say what effect an instruction so worded would have upon the jury, under the facts in this case. This court has said that when the evidence was so overwhelmingly against the defendant that had the jury been correctly instructed they must still, necessarily, have found as they did, we would decline to reverse for mere error of instruction, but where the evidence of guilt is not such that all honest minds of ordinary intelligence must necessarily come to the same conclusion after proper consideration, the accused is en-

titled to have it passed upon by a jury instructed with substantial accuracy as to the law applicable to the case. (*Hoge* v. *People,* 117 Ill. 35; *People* v. *McGinnis,* 234 id. 68.)    This instruction was also erroneous because it called attention to particular evidence, (*Hoge* v. *People, supra; Sheehan* v. *People,* 131 Ill. 22; *Clark* v. *People,* 224 id. 554;) and omitted all reference to the explanations of the plaintiffs in error as to why they left town.   Such explanations may not have been satisfactory, but they were entitled to be considered by the jury for what they were worth.   The giving of this instruction, under the facts in this case, constituted reversible error.

People's instruction 14 is also faulty in that it directs attention to only a part of the evidence on a particular question.   Several other instructions are complained of by counsel for plaintiffs in error, but while some of them are not worded with accuracy, we do not think substantial error was committed in giving or modifying them.

Whether the jury believed the testimony of Pezutto that he stayed in a house of ill-fame at Spring Valley on the night of the homicide might have had great influence upon them in reaching a conclusion as to his guilt.   The testimony of the keeper of the saloon, and his bar-tender, that there was no house of ill-fame over their saloon at that time was conceded by them, on motion for new trial, to have been false.   We are disposed, on the state of the record in this cause, to hold that as to Pezutto a new trial should have been granted on that ground.

For the errors indicated the judgment of the circuit court of LaSalle county will be reversed and the cause remanded.                     *Reversed and remanded.*