(No. 13726.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. JOSEPH WHEELER et al.—(JOHN B. TRAINOR, Plaintiff in Error.)

*Opinion filed April 21, 1921.*

1. CRIMINAL LAW—*when instruction may be given on subject of flight.* Under certain facts it is erroneous to instruct the jury that flight is evidence of guilt, but where there is evidence which tends to show that the defendants were observed at the scene of the crime, left immediately thereafter in an automobile, shot several times at their pursuers and resisted arrest when overtaken about twenty miles from the scene of the crime, it is not error to give such an instruction.

2. SAME—*what argument is not objectionable as a reference to failure of defendants to testify.* Where certain contradictory remarks made by one of the defendants at the time of his arrest in attempting to explain his presence with the other defendants are proved, comment by the State's attorney in his argument that an innocent man would not need to make false statements about where he was or what he was doing at a particular time is not an indirect reference to the failure of the defendants to testify.

WRIT OF ERROR to the Circuit Court of DeKalb county; the Hon. MAZZINI SLUSSER, Judge, presiding.

JAMES H. CARTWRIGHT, JR., for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, CASSIUS POUST, State's Attorney, and JAMES B. SEARCY, (LOWELL B. SMITH, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Joseph, Wheeler, Frank Krueger, Harold Toomey and John B. Trainor were jointly indicted by the grand jury of DeKalb county for burglary and larceny. The indictment charged Wheeler, Krueger and Trainor with prior convictions for felonies under the Habitual Criminal act. After a motion to quash the indictment was made and

297—19

overruled, defendants entered pleas of not guilty and were placed on trial. They were all found guilty. Wheeler, Krueger and Trainor were by the jury found guilty of having been previously convicted of felonies. A motion for a new trial was overruled and judgment and sentences rendered that they be imprisoned in the penitentiary for a term not to exceed the maximum term fixed by the statute. Trainor has sued out this writ of error.

In the early morning of September 18, 1919, the garage of Breunig & Dolder, in Somonauk, DeKalb county, Illinois, was broken into and ten automobile tires stolen. The day of September 17 there had been a celebration in Somonauk and a dance at night, which lasted till 2:30 in the morning. The garage was closed and locked by Breunig at 2:30 A. M. Between that time and 4:30 in the morning the large door into the garage proper was broken open and a door leading from the garage into a smaller room, called the "harness room," in which automobile tires and other accessories were kept, was also broken open and ten tires stolen. The night was rainy and the roads were muddy. Men were seen to break open the door and enter the garage. The owners of the garage were notified by telephone, and the owners and two brothers of Dolder arrived at the garage about 4:30, but the guilty parties had taken the tires and left. They discovered automobile tracks in the near vicinity, and in two automobiles they started in pursuit, Breunig in one car and Dolder and his brothers in another. Sandwich, Plano and other near by towns were notified by telephone, and before Breunig started in the pursuit he received word from the marshal of Sandwich, three and a half or four miles east of Somonauk, that a large, smooth-running car with curtains on had gone east through Sandwich about 4:35 or 4:40. The pursuers followed the tracks to Sandwich, and police officer Hickey, of Sandwich, who had notified the police of Plano of the car going that way, joined Breunig in his car in the pur-

suit to Plano.  A car was seen to pass through Plano by
the police officer a few minutes ahead of the pursuers, who
followed on to Kaneville, where they found a car at a gaso-
line filling station, and in the car were the four defendants,
who after a spirited resistance, during which several shots
were fired, were taken into custody.

Plaintiff in error contends that the evidence was not
sufficient to prove his guilt beyond a reasonable doubt;
that the court permitted incompetent evidence and gave one
prejudicial and erroneous instruction, and that the State's
attorney made improper statements in his argument to
the jury.

More than fifty witnesses testified for the State and
three for defendants.  The transcript of the testimony in
the record covers more than 1200 pages and the abstract
of it more than 400 pages.  It will therefore be imprac-
ticable within the reasonable bounds of an opinion to set
out the evidence in detail.  We can only refer in a general
way to the most important facts or testimony relied on by
the State.  That the garage was forcibly broken open, en-
tered, and tires of the value of $485 stolen, is undisputed.
The State introduced testimony that Wheeler and Krueger
were seen in Sandwich during the evening of September 17,
and one witness testified he there sold Wheeler a battery for
a flash-light, and he identified the battery in a flash-light
found in defendants' car when they were captured, as of
the same make and peculiar description as the one he sold
Wheeler.  A hat and a cap were found in the automobile
of defendants, which were identified as the hat worn by
Wheeler and the cap worn by Krueger when they were seen
in Sandwich.

The garage is situated on the east side of Depot street,
which is a north and south street and the principal busi-
ness street in the village of Somonauk.  Dr. Milliken's resi-
dence is on the west side of that street, the north side of
his residence being on a line with the south side of the

garage.  The street is sixty-six feet wide and the distance
from the residence to the garage is about eighty feet.  Mrs.
Baker, the mother-in-law of Dr. Milliken, testified her bed-
room was on the first floor and on the south side of the
Milliken residence; that there was a window on the south
side of her room, and that about ten feet south of her room
was a bank building.  Early in the morning of September 18
she heard a noise like someone picking at the back door
of the bank and heard someone walking between her room
and the bank.  She saw two men pass through to the street
in front.  She got out of bed and went into the parlor to
a window and very soon heard a noise across the street at
the garage like someone was breaking a door down.  She
saw a man peeping out of the door looking north and south
and saw a man in the building with a flash-light.  Two men
in the garage seemed to be standing on a shelf, reaching
up for something.  She saw one man rolling out tires and
two men loading them on their shoulders and arms and
then going south.  She watched them until they passed out
of her sight.  She saw a large car with a smooth-running
engine, curtains on, pass north toward the depot, then come
back and go on south.  The car had large wheels.

The witness' daughter, Laura Baker, testified she was
awakened by her mother.  She went to the window and
looked across the street and saw three men pushing and
prying at the garage door.  They got it open, went inside,
and the witness heard a cracking and breaking of wood.
She saw two men in the harness room taking something
off shelves.  One man came outside and stood watching.
She testified that man was defendant Toomey.  The wit-
ness then went and called her sister and Dr. Milliken.
She next saw three men going down the street with tires.
Toomey was in front.  She also saw Trainor.  They were
all walking down the street when she last saw them.  There
was a light in the harness room and a light in Harmon's
store, which is just across the street from the Milliken resi-

dence. Toomey was in front of the harness shop looking up and down the street. The witness testified she saw three of the men three days afterwards in jail and identified them at the trial as the men she saw at the garage.

Mrs. Milliken testified she saw the men in the harness room and one man standing outside. One of the men inside was trying to take something down and the other had a flash-light, which he was flashing on the tires. Trainor was standing on a shelf taking things down. Wheeler was the man who had the flash-light. She identified them at the trial, and also Toomey as the one who stood outside. She testified there was a light in the tire department and in Harmon's store. She saw three men with tires walk south. There was a street light at the crossing half a block away. The witness was positive in her identification of the men.

Dr. Milliken testified to being awakened at about 4:15 A. M. and saw one man standing in the garage door and two inside. The two inside were in the harness department,—one on a bench or something, reaching up. The witness went to the telephone and called for Breunig and Dolder, and for Hickey, the night policeman at Sandwich. After he finished telephoning witness went across the street to the garage. Breunig was then there. Two doors had been broken open. The witness testified he next saw the men in jail a few days after the burglary. He identified three of the defendants as the men he saw in the garage.

Lawrence Sherman, night watchman in the village of Somonauk, testified the night of September 17 was rainy. A Chicago, Burlington and Quincy passenger train was due at Somonauk at 4:36 A. M. The witness had been in the hotel on Depot street, near the depot and half a block north of the garage, with Delbert Prussing. Just before the arrival of the train and while witness was in the hotel he saw a large automobile, with curtains on, drive by, going toward the depot. It turned at the depot and came back past the

hotel. The witness saw the car defendants were driving the day they were captured, and said in his opinion it was the car he saw drive past the hotel, because it looked a good deal like it.

Delbert Prussing, an automobile mechanic, was in the hotel with Sherman until the arrival of the early morning train. He testified electric lights were burning in the streets and in front of the hotel porch. Witness saw an automobile pass the hotel, going north, and in a few minutes it came back and drove west. It was about 3:45 A. M. Witness remarked it was a Hudson car, because he noticed the rear hub-cap was diamond-shaped and the car was large. The curtains were on. Witness saw the car defendants were in when captured. It was a Jordan car. He testified its lines resembled a Hudson. It had a diamond-shaped hub-cap on one rear wheel.

The car defendants were in when taken was a large Jordan touring car and the license number on it was registered in the name of Frank Krueger. Breunig in one car and Dolder and his two brothers in another followed the tracks of an automobile. The tracks were made by a tire about 4½ to 5 inches wide with a bead around the center, one or two rows of inverted T's on each side of the bead interlocking each other. Policeman Hickey, of Sandwich, saw a car pass through Sandwich about 4:35 and identified the car captured with defendants at Kaneville as the same car. Hickey telephoned the police at Plano and joined Breunig in his car. Policeman Wright, at Plano, saw a car approaching from the west with head-lights and spot-light on. He walked out in the street and commanded the car to stop. It did not do so, and he told the parties if they did not stop he would shoot. Someone in the car said, "All right; wait a minute." They pulled up within a few feet of the officer, then swerved and went by him very fast. He fired at the rear wheels and back end of the car with a shot-gun. Two shots were fired from the car. In a few minutes he

heard two more shots and two revolver shots. They were in the direction the car went. The witness followed in the direction the car went until he met Zellar, the night watchman, and they both got in a car and followed the two pursuing cars which had passed through the town, overtaking them about three-quarters of a mile east of town. Zellar testified he had been informed by telephone of the burglary at Somonauk and went down to the east part of Plano, on Main street. From there he heard some shots to the west and afterwards saw an automobile coming toward him with head-lights and spot-light on. When the car was within about one hundred feet of him a shot was fired from it. The car went a few yards further and another shot was fired. By that time the car was probably within sixty feet of the witness and he fired at the car, but the spot-light blinded him so he could hardly see. As the car came closer he fired again. He used a double-barrel shot-gun. After the car passed him a shot was fired from the car. The witness testified he fired at the front of the car with his shot-gun. When the pursuing cars came up to defendants' car at the gasoline station in Kaneville, Breunig testified he heard someone in the car say, "We are all in, boys; we had just as well give up the hook;" and another voice in the car said, "Hands up! Up with them!" Hickey jumped from Breunig's car with his shot-gun before it had fully stopped. A shot was fired from the car through the windshield of Breunig's car, slightly wounding his little finger. Defendants then jumped out of the car, each armed with a gun, and all began shooting. The fire was returned by one of the Dolders and Hickey, who were armed with shot-guns. Trainor and Wheeler were hit and all were finally taken into custody. The rear of defendants' car bore marks of having been hit with a shot-gun and the marks had been smeared over with mud. The license plate had been smeared over with something, and there was a shot-gun mark in the hood, back of the radiator. In the car was

found a suit-case, in which and in the car were found maps, compasses, cartridges, dynamite caps and fuses, pliers, punches, drills, braces, bits, chisels, files, drill plates, candles, soap, silk gloves, wrenches, skeleton keys, hammer, a coil of rope and a flash-light. In the front part of the car were found several empty cartridge shells. Defendants attempted to throw their guns away or conceal them before they were finally captured. When Wheeler was captured he stated to the man who took him in custody that he was a tramp and had been picked up on the road by the men in the car. Breunig testified he discovered Wheeler hiding in underbrush or weeds behind a chicken house, where he fled during the shooting, and that he said he had been sleeping there all night,—that he was a tramp. He had been shot in the neck, and the top of his head was bleeding. Witnesses for the State testified to statements made by Krueger and Trainor after their arrest, and some of them while they were in jail, which were of a very damaging nature and of a character which would not usually be made by innocent men. An inmate of the jail testified he heard Trainor say, "It is damned funny they followed our car and did not follow the other car." Fred Dolder testified that Trainor said to him in the jail they had nothing on them (defendants) except "those damned burglar tools." Dolder replied they had, and if it had not rained "we never could have got you," to which Trainor replied, "The rain got us in bad."

Much other testimony tending more or less to show defendants' guilt was heard on behalf of the People. The witnesses on behalf of defendants were an engineer, who testified to the locations of the garage and the Milliken residence and to measurements and distances; a carpenter, who testified that in November, after the burglary, he planed and mended the doors which had been broken open; and a witness who testified to the location of the tire rack in the harness room.

Counsel for plaintiff in error has filed an able brief in support of the errors assigned and without unnecessary prolixity has clearly and forcibly presented his arguments. In support of the contention that the proof was not sufficient to overcome, beyond a reasonable doubt, the presumption of innocence, it is argued with much force that the witnesses who were in Dr. Milliken's residence and testified they saw the three men committing the burglary sufficiently well to afterwards identify them is too absurd to be believed. It is unquestionably rather extraordinary. There was a single-bulb incandescent light burning in the room where the tires were, which enabled the witnesses to see the interior of the room and the men in there. There was also a light in Harmon's store, immediately south of the garage, and clusters of two or three incandescent lights at the street crossing distant about a half block from the garage. One of the men in the tire room used a flash-light. There was also a light in the bank, just south of Milliken's. While it is possible the lights outside the tire room to which reference has been made might aid one in the position of the witnesses at the Milliken residence to see the features of a man on the sidewalk or in the street, they would hardly do so when a man was inside the tire room. The only aid to recognition in there was the single incandescent light and the flash-light. The latter was only used at intervals and its flashes were of short duration. Attention is called to the fact that it was raining. Under all the circumstances, ought a reviewing court to say such testimony of identification is unworthy of credit and should not have been believed by the jury? The witnesses were very intelligent, and the record discloses no indication of any prejudice or ill-feeling or any reason why they had any desire for or interest in the conviction of the parties. The identification of the parties who committed the crime does not depend, alone, on the testimony of the witnesses who saw the men at work. The proprietors of the garage were notified by

telephone by Dr. Milliken and were there within a few min-
utes after the burglars left and after a large car with cur-
tains on had been seen to drive north a short distance, then
come back and pass out of town.  The tracks were very
quickly followed by Breunig and Dolder in two cars, and
it was discovered that the tracks had marks which enabled
them to follow the car that made them until it was over-
taken at Kaneville.  The proof shows the parties in that
car were driving very fast, and from what occurred at
Sandwich and Plano, as well as at Kaneville, they did not
intend to allow anyone to interfere with their progress.
The only thing wanting for absolute demonstration that de-
fendants were the men who broke into the garage and stole
the tires is that they did not have the stolen tires when
captured, and so far as this record shows the tires have
never been found.  There is some evidence tending to show
that there was another car.  Harry Renton, a farmer, tes-
tified that early in the morning he saw two cars on the
road in the vicinity of Mack's Corners, where a north and
south road and an east and west road intersect.  When he
first saw them they were not moving and no lights were
on.  In a few minutes the lights were turned on and the
cars moved north to Mack's Corners and turned west.  That
was the last he saw of them.  A rural mail carrier testified
that in the morning of the 18th he saw at Mack's Corners
two automobile tracks,—one made by a Miller tire and one
by a Blackstone tire,—the latter a large tire with a large
bead T in the center and double T's on each side.  Witness
used the same tire but of smaller size on his Ford car.  The
car with the Miller tire continued on west and the car with
the Blackstone tire turned north somewhere west of Mack's
Corners, going from there on a road not very much trav-
eled.  It was this track the pursuers followed to Kaneville.
Statements made by defendants after their arrest, testified
to by witnesses for the State, as we have said, indicated
they were the men who broke into the garage.  A narrow

bar left at the garage by the guilty men had been used to pry the bottom of the doors, and a wider and more blunt bar found in defendants' car fitted the other marks made in prying the sides of the doors. Considering all the testimony it appears abundantly sufficient to warrant the verdict.

It is contended the evidence did not identify Trainor as the man convicted in the criminal court of Cook county in 1893 of a felony under the name of James Keating, *alias* Barney Hunt. Dennis Keating, a police officer of Chicago, testified he knew Trainor as Barney Hunt; that he arrested him in 1893 under the name of James Keating for holding up a horseman and turned him over to another officer. The witness was not present at the trial. A certified copy of the record of the indictment, conviction and sentence of James Keating, *alias* Barney Hunt, for robbery, was introduced, and a certified copy of the record of the clerk of the penitentiary showing photograph, Bertillon measurements, date of his receipt for the crime of robbery and date of discharge. Barry, deputy sheriff and jailer, testified that while in jail Trainor told him he had served time in Joliet; that he had been accused of "sticking up" a man and had served three years for it but that he was not guilty. Ashton, a post-office inspector, testified he had known Trainor about four years; that shortly after September 18 he had talked with him in the jail, and in the course of the conversation Trainor told the witness he served time in Joliet in 1893 under the name of Keating. Crum, a prisoner in the jail, testified Trainor was called out to see someone, and when he returned said it was a "copper" from Chicago; "that is the flannel-mouth Irish s— of a b— that pinched me and sent me to Joliet one time." We are of opinion the plaintiff in error was sufficiently identified as the man convicted and sentenced to the penitentiary.

We are of opinion no prejudicial error was committed by the court in the admission of testimony.

It is ably and earnestly contended the court erred in giving an instruction for the People on the subject of flight. The instruction told the jury that flight of a defendant charged with crime is evidence tending to prove guilt, and if the jury believed, beyond a reasonable doubt, defendants, after the commission of the offense charged, fled and tried to avoid arrest, the jury might take that fact into consideration in determining their guilt or innocence. It is argued the instruction assumed the defendants were at the scene of the crime. They were not residents of that vicinity but so far as the evidence shows they were residents of Chicago, and it is argued there was no reason if they were at Somonauk why they should remain there or delay getting away from that place. Under some facts it has been held erroneous to instruct that flight is evidence of guilt, (*Fox* v. *People,* 95 Ill. 71; *People* v. *Pezutto,* 255 id. 583;) and while the attack made on the instruction given in this case is forceful and the argument plausible, we are of opinion there was evidence upon which to base it and giving it was not reversible error.

It is also contended that the State's attorney indirectly and covertly referred in his argument to plaintiff in error's failure to testify on the trial. In the course of his comments on the testimony the State's attorney referred to the contradictory statements made by Wheeler, after his arrest, to different witnesses for the State about being an old tramp and having slept in the weeds all night, and about having no gun; and to another, that he was a tramp and had been picked up, just before they were overtaken at Kaneville, by the other three defendants, and that they were strangers to him. The State's attorney declared that an innocent man did not need to conceal or make false statements about where he was or what he was doing at a particular time; that the first thing an innocent man would do would be to inform the parties taking him into custody where he was and produce the evidence, if he had

any. This argument only referred to contradictory statements made by the defendant Wheeler when arrested and Trainor was in no way referred to. We do not understand it as an indirect or covert reference to Wheeler's failure to testify on the trial, nor that it can be construed in any remote sense as calling the jury's attention to the failure of Trainor to testify. It was legitimate argument as applied to Wheeler.

We have examined the record and the briefs of counsel with care and are satisfied the proof was sufficient to warrant the conviction of plaintiff in error, and that there were no errors committed on the trial which would justify a reversal.

The judgment is affirmed.          *Judgment affirmed.*