(No. 15434.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROLLA SPAULDING, Plaintiff in Error.

*Opinion filed October 20, 1923.*

1. CRIMINAL LAW—*rule as to admissibility of evidence tending to disclose another offense.* If evidence offered in a criminal case is relevant and tends to prove a material fact pertinent to the issue, it is not rendered inadmissible because it tends to show that the defendant was guilty of another offense.

2. SAME—*when facts tending to show killing of eye-witness to crime charged are admissible.* On a trial for murder of a policeman, evidence tending to show the disappearance of the defendant's confederate, the only known eye-witness to the crime, the subsequent finding of a skeleton in a shallow grave near the isolated cottage where the defendant was hiding, the identification of the skull as that of the missing man, the burning of the cottage, and other facts tending to show that the defendant killed such confederate to prevent his testifying against him concerning the killing of the police officer, is admissible.

3. SAME—*when instructions do not assume facts.* Instructions to the effect that if the jury believe from the evidence, beyond a reasonable doubt, that the defendant was present at the time the crime was committed, if any, and immediately fled from the scene of the crime and lived under an assumed name, then the jury may take such flight into consideration in determining the question of defendant's guilt, are not erroneous as assuming the facts stated.

4. SAME—*when instructions singling out particular facts are properly refused.* In a criminal case, instructions singling out particular items of evidence and stating that proof of such fact, alone, does not establish the defendant's guilt are properly refused, particularly where the instructions given fully cover all the points in

the refused instructions which the defendant was entitled to have the jury consider.

5. SAME—*counsel for the People have the right to denounce defendant if evidence warrants statements.* In a murder trial it is not improper for counsel for the People to denounce the defendant as a thief and a gunman, where such statements are based upon evidence in the record from which such facts may be legitimately inferred.

6. SAME—*when alleged misconduct of those in charge of jury will not reverse.* Alleged misconduct of officers in charge of the jury in permitting the jurors to separate, the finding of a newspaper in the jury room containing an account of the trial, and the reading by the State's attorney, in the presence of the jury, of a newspaper having headlines referring to the case, will not cause a reversal where no prejudice to the defendant from such irregularities is shown.

7. SAME—*purpose of reviewing court is to determine whether accused has had a fair trial.* It is not the purpose of a reviewing court to determine whether the record in a criminal case is perfect, but its purpose is to determine whether the accused has had a fair trial and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt.

WRIT OF ERROR to the Circuit Court of Stark county; the Hon. JOHN M. NIEHAUS, Judge, presiding.

SCHOLES & PRATT, and JOHN W. FLING, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, E. J. GALBRAITH, State's Attorney, and FLOYD E. BRITTON, (R. L. THURMAN, FLOYD BRIAN, SCOTT W. LUCAS, and J. L. FULLER, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

About 9:30 P. M., Monday, June 12, 1922, Arthur Smith, a constable of the town of Richwoods, in Peoria county, was shot and killed on a public highway near Bradley Park, in the city of Peoria. There were no lights or

residences near the scene of the homicide. Smith and another constable, Joseph Turner, were driving along the highway in Turner's car when they came upon two automobiles standing without lights at the south side of the road. At Smith's request Turner stopped his car and Smith got out to investigate. The two cars were headed east, and as Smith walked around the car in which he had been riding he was a few feet north of and about even with the rear of the second of the two cars. He called out, "What are these dark cars doing here?" Two men ran toward the front car and a third man standing behind the second car fired several shots at Smith. Three shots entered his body and he was instantly killed. Finding his companion dead, Turner ran three blocks to the rear entrance of Bradley Park, where he met a police officer and another man and with them returned to the scene of the homicide. The cars were there but the men were gone. The first car was a Dodge sedan and the other a Buick touring car. The spare tire had been taken from the Buick and was lying on the ground between the two cars. Under the rear axle and near the right wheel of the Buick was a jack, and two of the rim lugs had been taken off and others were loosened. A flashlight and tools for removing the tire from the wheel were lying on the ground. The police officer went back to Bradley Park, where he had left his motorcycle, mounted it and rode three miles to the police station, where he reported the homicide to the police department and the sheriff. It was then 9:45 P. M. Officers were immediately dispatched to the scene. The Buick car was identified as one which had been stolen from its parking place about a block from the court house in Peoria about nine o'clock that evening, and the Dodge car was identified as the property of Rolla Spaulding, plaintiff in error. Alongside the driver's seat of the Dodge, in the pocket of the left-hand front door, was found an automatic pistol magazine full of cartridges loaded with .380-caliber steel jacketed bullets, and a canvas

sack containing thirty-five or forty cartridges of the same character. On and under the right-hand running-board of the Buick were found three exploded shells of identical make, size and description. Two bullets were removed from Smith's body and they were .380-caliber steel-jacketed bullets. When the Buick was parked it was locked with a switch key. When it was found there was a "jumper" placed across the wires of the ignition system, making it possible to start the motor without turning the switch. Officers of the city and county searched for plaintiff in error throughout the city of Peoria without success.

Plaintiff in error is an automobile mechanic and for some time prior to the homicide was engaged in dealing in second-hand automobiles. January 11, 1922, he bought a Remington .380-caliber automatic pistol at a gunstore in Peoria. The evening before the homicide two police officers saw the plaintiff in error and John Schorr driving the Dodge sedan found at the scene of the homicide. The officers stopped them and walked up to the car to talk with them about some matter not material here. One of the officers took from the pocket of the left-hand door of the car a Remington .380-caliber automatic pistol, examined it, showed it to his brother officer and then returned it to the place where he found it. At 8:30 P. M. on the evening of the homicide two other police officers saw plaintiff in error and Schorr driving in the Dodge sedan in the business district of Peoria. The morning following the homicide Schorr came to the police station and inquired if he was wanted for anything. His clothes were wet and covered with weed and grass seeds. It had rained during the latter part of the night. He was taken into custody and detained for several days but was finally released.

Plaintiff in error left Peoria in a Ford touring car with two companions some time before ten o'clock on the night of the homicide. At 10:30 he stopped at a farmhouse on the hard road eighteen miles south of Pekin to get some

water for the car in which he was riding. The car was an old one and the radiator was leaking and nearly empty. The water in the radiator was boiling. Two men were on the front seat and plaintiff in error was riding in the rear. He got out of the car, asked for some water, filled the radiator and offered to pay the farmer for his trouble. The men left the farm driving rapidly. Some months before, the plaintiff in error had leased a cottage about seven miles north of Havana, in Mason county. The cottage was located among the sand hills along the Illinois river and was surrounded by timber and dense underbrush. It was about a quarter of a mile from the nearest public highway, which was little traveled except by the few farmers living in the neighborhood and by hunters and fishermen. Plaintiff in error was known in the neighborhood as Bob Anderson. His nearest neighbor lived about half a mile away. Sometimes his neighbors would see him every day for two or three days and then he would not be seen at all for a few days. He arrived at his cottage some time during the night of the homicide and was there the next morning. During the day he went with a fisherman to Liverpool, a river town near by, and he told this fisherman not to tell anyone his name. Plaintiff in error received and read the Peoria daily newspapers giving the account of the killing of Smith and telling of the finding of the Dodge sedan of plaintiff in error at the scene of the killing. He wrote to his attorney, Henry Pratt, in Peoria and asked him to come to see him. He met and talked with Pratt on June 18. The following morning Pratt inquired at the sheriff's office if plaintiff in error was wanted for the killing of Smith, and upon receiving an affirmative reply he said he would produce him when the proper time came. About a mile from the cottage occupied by plaintiff in error was one owned by some people named Strawn, who lived in Peoria. Sometimes the plaintiff in error occupied this cottage and he was on intimate terms with the Strawns. June 23 he called the

Strawns over the telephone and during his conversation said, in substance, "See that fellow and have him bring my car down here." June 28 he again called the Strawns in Peoria and during the conversation said, in substance: "Why doesn't that fellow bring my car down here? Will you see him and tell him to come down with my car?" Just before this last conversation he had written his attorney to meet him in Mason City, and pursuant to this request there was a meeting in Mason City July 1. July 4 his cottage burned. July 8 he was walking in the wheatfield of a neighboring farmer, and during the conversation with him the farmer said he had seen in the Peoria paper that a policeman had been killed in Peoria. Spaulding made no reply but complained of a shortage of breath and said he had heart trouble, and picking up a rifle which he had set down walked away toward his home. July 9 plaintiff in error told some of his neighbors that he was going to Beardstown, which is forty miles down the river, and that he would be gone for a month. Immediately after telling this story he went up the river in a gasoline launch to Peoria and after further consultation with his attorney he surrendered to the sheriff of Peoria county. July 10 some farmers hunting in the woods came upon a human skeleton partly buried in a shallow grave, which was partly concealed with the top of a fallen tree. This grave was about three-fourths of a mile from the cottage in which plaintiff in error had lived and about 300 yards from the Strawn cottage. The body had been buried in lime and most of the flesh was gone. There was a bullet hole through the front of the skull and the back of the skull was shattered. The measurements of the body and skull corresponded with the Bertillon measurements taken of Schorr by the Peoria police. Schorr's mother examined the body, the skull and its teeth and positively identified the remains as those of her son. He had left her home the morning of June 30 and she had not heard from him since.

Plaintiff in error was indicted by the Peoria county grand jury for the murder of Smith. On his motion the venue was changed to Stark county. He was tried and convicted and his punishment fixed at imprisonment in the penitentiary for his natural life. He prosecutes this writ of error to reverse the judgment of conviction.

From reading this record we gather that the theory of the State is that Spaulding, Schorr and two other men stole the Buick car and took it to a point beyond Bradley Park for the purpose of stripping it of its accessories; that Spaulding shot Smith to prevent arrest and then fled from the scene in the Ford car, which had been planted for just such an emergency as occurred; that Schorr failed to get in the car and stayed in hiding all night; that Spaulding and his companions drove south from Peoria over the hard road to a point east of Spaulding's cottage and thence to the cottage; that through the Strawns Spaulding enticed Schorr to his cottage June 30; that Spaulding killed Schorr, stripped him of his clothing and buried him in lime so that his body would decompose rapidly; that he saw his attorney the following day in Mason City, and, feeling secure, made arrangements with his attorney to surrender; that he burned the cottage July 4 to remove all trace of Schorr's clothing and all evidence of the killing of Schorr; that he waited until sufficient time had elapsed for Schorr's body to decompose, and feeling secure after disposing of the only known eye-witness to the crime he surrendered. Plaintiff in error denies being in Peoria at the time Smith was killed and disclaims any knowledge of the killing.

Plaintiff in error testified that the automatic pistol which he bought in January, 1922, was stolen from him about a month later and that he had not owned a pistol since that time; that two police officers did stop him and Schorr on the evening of June 11, but that they did not take an automatic pistol from the door pocket of his automobile and that there was none there; that when the two officers saw him

and Schorr about 8:30 on the evening of June 12 he and Schorr were on their way to his cottage in Mason county; that they drove across the bridge to East Peoria and stopped at a gasoline service station a short distance from the bridge; that the man in charge asked him if he knew the road to Havana, and that he said he did; that the service man told him two men then sitting at the station in a Ford car were inquiring the way; that he went to the car and told the two men he was going that way and would be glad to ride with them in the car and show them the road; that they agreed to this, and he told Schorr to take his Dodge sedan back to Peoria and keep it until he called for it; that he did not know the two men in the Ford car; that he got into the rear seat of their car and left East Peoria with them about 8:45 P. M.; that they drove through Pekin and from there on the hard road to a farmhouse east of his cottage; that they stopped at this farmhouse and filled the radiator with water; that they drove beyond the farmhouse about half a mile and then turned west and drove along the public highway to a point near his cottage; that he directed the two strangers how to find Quiver Beach, which is a summer resort on the Illinois river east of Havana, and that they drove away; that he walked from there to his cottage; that about June 14 he received a copy of a Peoria daily paper which told of the shooting of Smith; that the next day he read in a Peoria daily paper that his Dodge sedan had been found at the scene of the homicide; that thereupon he wrote a letter to his attorney and asked him to come to see him; that he had a conference with his attorney, and that he went to Quiver Beach and attempted to locate the men with whom he had driven from East Peoria; that he was not able to locate them; that he lived under the name of Bob Anderson because he was working on an invention and did not want to be disturbed; that he had not seen Schorr since he left him in East Peoria the night of June 12 and that Schorr had not been to his

cottage; that he made no effort to get in touch with Schorr to find out from him how his car happened to be at the scene of the homicide; that the person to whom he referred in his telephone conversation with Mrs. Strawn was his attorney.

Otto Swanson testified that he was in charge of the service station in East Peoria the evening of June 12; that about 8:30 o'clock two men driving a Ford car stopped and bought some gasoline and oil and inquired the way to Havana; that he did not know the way and was looking at a map when two men driving a Dodge sedan stopped at his station; that he did not know any of the four men but now identifies one of the men riding in the Dodge sedan as plaintiff in error; that he asked plaintiff in error if he knew the way to Havana, and he replied he did; that plaintiff in error went to the Ford car and told the men in it that he was going to Havana and that if they had no objections he would ride with them and show them the road; that plaintiff in error told the other man in the Dodge sedan to take it back to Peoria; that he then got in the rear seat of the Ford touring car and left with the two men who were already in it; that he did not know that plaintiff in error was suspected of being connected with the killing of Smith until October 6, when he was interviewed by attorney Pratt; that at that time he did not know the exact date of the occurrence; that February 9 Pratt called his attention to the fact that the occurrence related by him took place on the night Smith was killed, and that that was the first time he ever connected the appearance of plaintiff in error at his oil station in East Peoria with the killing. Without reciting inconsistencies in the testimony of Swanson and contradictory statements made by him at other times, it is sufficient to say that his testimony is wholly unreliable. The jury was warranted in disregarding it.

No man with an open mind can read this record without being convinced that plaintiff in error killed Smith. He

was a dealer in second-hand cars.  He was an automobile mechanic.  He was driving in the business section of Peoria in his Dodge sedan about the time the Buick touring car was stolen.  The person who stole the Buick knew how to complete the circuit without using the ignition switch.  His car was found at the scene of the homicide and the constable was killed by bullets from a gun exactly like one owned by plaintiff in error.  His statement that his gun was stolen is disproved by testimony of the police officers who saw it in his possession the day before the killing, and by the circumstance that in the pocket of the car which he claims was bought by him two months after the gun was stolen, there were found a loaded magazine and cartridges suitable for use in the gun.  Knowing that his car was found at the scene of the homicide he remained in hiding for a month while he was in communication with his attorney and others in Peoria.  He made no effort to secure his car or to explain its presence at the scene.  He requested one of his neighbors, who knew him as Bob Anderson only, to not introduce him in Liverpool, evidently fearing that someone who knew him as Spaulding might reveal his duplicity.  He would not discuss the homicide with the farmers living in the neighborhood and walked away from them when it was mentioned.  He concealed the name of the person concerning whom he was talking over the telephone when inquiring about his car.  His contention that he was referring to his attorney is absurd.  He was in communication with his attorney by mail and could have reached him easily by telephone.  There is no doubt that he was referring to Schorr.  He does not produce the Strawns as witnesses nor does he account for their absence, although Mrs. Strawn seemed to know about whom he was talking when he referred to the person who had his car.  His explanation of why he lived in Mason county under an assumed name is far from convincing.  Knowing that he was wanted in connection with the killing of Smith, he re-

mained in hiding under an assumed name until, for some reason unexplained by him, he considered it safe to surrender. His story of turning his car over to Schorr in East Peoria and driving to Mason county with two strangers does not appeal to the reasonable mind. No jury could be expected to believe that plaintiff in error would get into an old car driven by strangers and drive more than forty miles without introducing himself or without ascertaining their names or their place of residence, nor is it at all likely that two men would permit a total stranger whom they had picked up on the highway, to make arrangements for water for their car and carry the water and fill the radiator while they remained in the car. These strangers disappeared as mysteriously and conveniently as they appeared.

After the circumstances concerning the disappearance of Schorr and the finding and identification of his body had been proven his skull was received in evidence. Plaintiff in error objected to its admission, and at the close of the evidence moved that all the evidence concerning the discovery and identification of the skeleton be stricken on the ground that it was evidence of a crime other than the one charged in the indictment. Whether the skeleton was that of Schorr and whether plaintiff in error killed him for the purpose of suppressing his testimony were questions of fact for the jury. (*People* v. *Fisher,* 303 Ill. 594; *People* v. *Foster,* 288 id. 371; *People* v. *Bond,* 281 id. 490.) Plaintiff in error made no effort, by cross-examination of witnesses for the State or by the production of other evidence, to show that the skeleton was not that of Schorr. It was clear from the evidence produced that the person whose skeleton was found buried in that lonely, secluded spot among the wooded sand hills along the Illinois river had been killed by a rifle or pistol shot and that the murderer had removed the clothing and buried the body in lime for the purpose of concealing its identity. Taking into consideration the fact that the flesh was gone, the measurements of the skeleton

corresponded with the measurements of Schorr. June 28 plaintiff in error urged Mrs. Strawn to see some person in Peoria and send him down to his place of hiding with his car. The person to whom plaintiff in error referred was undoubtedly Schorr. Schorr left his mother's home June 30 and no person has seen or heard of him since. A skeleton identified as Schorr's was found near the place where plaintiff in error lived. The cottage occupied by plaintiff in error burned shortly after Schorr's disappearance. He had left the cottage about twenty minutes before neighbors discovered smoke rising in the woods in that location, and when he and his neighbors discovered that it was his cottage burning he showed little concern about it. If plaintiff in error killed Schorr he probably killed him while he was sleeping in this cottage. A fire would remove all trace of blood-stains, of the bullet that went through Schorr's head, and of Schorr's clothing. Schorr was undoubtedly present at the killing of Smith and he knew who his accomplices were. He had talked to the police and his accomplices did not know what he had told them. Plaintiff in error had called for him to come to see him, and after five days of waiting he made a second call and urged the Strawns to produce him. Two days after that he disappeared. The evidence showing clearly that plaintiff in error was one of Schorr's accomplices in the killing of Smith and the evidence indicating that Schorr was avoiding him, plaintiff in error had reason to question his loyalty and had motive for disposing of him, thereby suppressing his testimony. From the evidence in the record circumstances point strongly to the fact that plaintiff in error did kill Schorr. Plaintiff in error not being on trial for his murder it was not necessary for the State to establish this fact beyond a reasonable doubt. As we have said, the weight of the facts and circumstances connected with Schorr's disappearance and the discovery and identification of his skeleton were questions

of fact for the jury. The only question for us to determine is whether this evidence was properly admitted.

That evidence offered proves or tends to prove an offense other than the one with which the defendant is charged is never a valid objection to its admissibility. When such evidence is offered the same considerations with respect to its admissibility arise as upon the offer of any other evidence. The question is, Is the evidence relevant? Does it tend to prove any fact material to the issue involved? (*People* v. *Jennings,* 252 Ill. 534; *Farris* v. *People,* 129 id. 521; *People* v. *Tucker,* 104 Cal. 440, 38 Pac. 195; *Commonwealth* v. *Snell,* 189 Mass. 12, 75 N. E. 75.) Evidence of other offenses wholly disconnected with the offense charged is not admissible, for the reason that it does not tend to establish the fact in controversy. Guilt cannot be shown by showing that the defendant has committed other offenses, but where relevant evidence is offered it is admissible notwithstanding it may disclose another indictable offense. (*People* v. *Cione,* 293 Ill. 321.) There are many cases which hold that where the motive for the crime charged is the concealment of some other crime, either by destroying the evidence of such other crime or by killing a witness who could testify relative to it, the evidence of such motive is admissible even if it does show the commission of an extraneous crime. (*Moore* v. *United States,* 150 U. S. 57, 14 Sup. Ct. 26; 8 R. C. L. 203.) In *People* v. *Harris,* 136 N. Y. 423, 33 N. E. 65, the defendant was charged with the murder of his wife. It was held that it was proper to produce evidence that the defendant had kept his marriage a secret, had produced an abortion on his wife, had maintained illicit relations with other women, and that he had stated that he was married to two other women, notwithstanding it proved separate and distinct offenses, because the evidence was relevant in that it established a motive for the murder. In *State* v. *Pancoast,* 5 N. D. 516, 67 N. W. 1052, the defendant was charged

with the murder of his wife. The State was permitted to produce evidence that tended to show that defendant was guilty of a number of offenses; that he had expressed a fear that his wife would learn of these offenses, and that he procured the murder of his wife so that she could not expose him, on the theory that the evidence tended to show the motive for the commission of the crime for which he was being tried. In *State* v. *Kline,* 54 Iowa, 183, 6 N. W. 184, the defendant was convicted of an assault with intent to murder a woman with whom he had been keeping company. For the purpose of showing motive, evidence was admitted to show the seduction of the prosecuting witness by defendant, her pregnant condition, and that he had procured abortive drugs and solicited her to take the same. In *Pontius* v. *People,* 21 Hun, 328, the defendant was convicted of assault with intent to kill. For the purpose of showing a motive for the assault it was held proper to prove that the person assaulted held two notes which defendant had forged. In *Dunn* v. *State,* 2 Ark. 229, the defendant was convicted of the murder of a detective. Proof that the detective was investigating a previous murder committed by defendant was held properly admissible. In *Blackwell* v. *State,* 29 Tex. App. 194, 15 S. W. 597, on a trial for murder it was held proper to prove that defendant had committed a theft and arson and that he killed deceased in order to effect his escape. When a suspected person attempts to escape or evade a threatened prosecution it may be argued that he does so from a consciousness of guilt, and so it is admissible for the prosecution to show that the prisoner killed an officer in attempting to escape or that he attempted to bribe witnesses to the crime. *People* v. *Johnson,* 286 Ill. 108; 2 Wharton on Crim. Evidence, (10th ed.) 1495.

From the days of Moses to the present time it has been the law that a person who fabricates, suppresses or destroys evidence must take the consequences of the honest indignation which his conduct naturally excites. Moses de-

clared, "Cursed be he that removeth his neighbor's land-
mark." (Deut. 27, 17.) Modern decisions establish the
rule that all efforts by either party to a suit, directly or in-
directly, to destroy, fabricate or suppress evidence may be
shown as a circumstance indicating that the party's cause
is an unrighteous one. (*Winchell* v. *Edwards,* 57 Ill. 41;
*Chicago City Railway Co.* v. *McMahon,* 103 id. 485; *Tan-
ton* v. *Keller,* 167 id. 129; 1 Wigmore on Evidence,—
2d ed.—sec. 278; Burrill on Circumstantial Evidence, 419.)
Evidence that the accused has attempted to destroy evi-
dence against himself is always admissible for the purpose
of showing consciousness of guilt, (*People* v. *Fox,* 269 Ill.
300,) as is also evidence tending to show an attempt to
bribe witnesses. (*State* v. *Constantine,* 48 Wash. 218,
93 Pac. 317; *Commonwealth* v. *Min Sing,* 202 Mass. 121,
88 N. E. 918; *State* v. *Huffman,* 86 Ohio St. 229, 99 N. E.
295.) In *People* v. *Roberts,* 306 Ill. 240, evidence showing
that the defendant arranged for the conveyance out of the
State of the prosecuting witness and gave her money to re-
main away from the county during the trial was consid-
ered admissible for the purpose of showing consciousness
of guilt. *State* v. *Keith,* 47 Minn. 559, 50 N. W. 691, and
*Blair* v. *State,* 72 Neb. 501, 101 N. W. 17, are similar
cases and the holdings are the same. In *Bowman* v. *United
States,* 267 Fed. 648, the defendant was convicted of mur-
der. It was held proper to prove that he had threatened to
kill the only eye-witness to the murder and that he had as-
saulted the witness with intent to kill.

Since it is competent to produce evidence of flight, con-
cealment, bribery of witnesses, assault upon witnesses, at-
tempts to break jail and to bribe or kill officers, it is cer-
tainly competent to produce evidence showing or tending to
show that the accused has killed an eye-witness to the crime
for which he is being tried. The evidence concerning the
disappearance of Schorr and the discovery of his skeleton
in the vicinity of the place where plaintiff in error was liv-

ing, the circumstances indicating an attempt to conceal the body and its identity, and the identification of the body, was relevant, for the reason that all the evidence in the record tends to show that Schorr was the only known eye-witness to the murder of Smith and that it .was to the interest of plaintiff in error to suppress his testimony.

Plaintiff in error also contends that in two instructions concerning the presumption arising from flight, given on behalf of the People, there is error, in that the instructions assume that the testimony shows what he was doing at the time of the homicide and that he was present when the shooting occurred and was one of the men seen running away. He relies upon the holding of this court in *People* v. *Pezutto,* 255 Ill. 583, and *People* v. *Rischo,* 262 id. 596, but the instructions given in this case are not subject to the same criticism as the instructions there under consideration. It is distinctly said in these instructions, that "if you believe from the evidence in this case beyond all reasonable doubt that the defendant was present at the time the crime was committed, if any, and immediately fled from the scene of the crime and lived under an assumed name," then the jury had a right to take into consideration such flight in determining the question of the guilt of plaintiff in error. The instructions were properly given. *People* v. *Wheeler,* 297 Ill. 289.

Plaintiff in error contends that the court erred in refusing to give his instructions numbered 21, 24, 25, 26 and 27. No. 21 tells the jury that the fact. that the automobile of plaintiff in error was found at the scene of the crime does not, of itself, justify a verdict of guilty. No. 24 tells it that the prosecution must not only prove that plaintiff in error purchased a .380-caliber automatic pistol January 11, 1922, but it must prove that that was the pistol with which the murder was committed. No. 25 tells the jury that the fact that plaintiff in error assumed the name of Bob Anderson, bought a .380-caliber automatic pistol, and was the

owner of the Dodge sedan found at the scene of the crime, did not, without other proof, establish his guilt. No. 26 tells the jury that proof of the fact that plaintiff in error assumed the name of Bob Anderson does not, of itself, establish his guilt. No. 27 tells the jury that before it can find plaintiff in error guilty of the murder with which he is charged, the prosecution must prove that he, and no one else, fired the fatal shots which caused the death of Smith. All these instructions were properly refused. Nos. 24 and 27 were clear mis-statements of the law, and all five of the instructions were subject to the vice that they singled out particular facts and told the jury that proof of such particular facts, without more, did not establish guilt. If a fact is competent evidence it should be considered by the jury, and if the court should instruct the jury that each item of evidence would not, of itself, prove the case, the tendency of such instructions would be to minimize the weight to be given to each particular item so considered and so to minimize the weight of all the evidence. (*Chaney v. Baker*, 304 Ill. 362; *Drda v. Drda*, 298 id. 278.) The court had given to the jury, on behalf of plaintiff in error, other instructions which told it, in substance, that the evidence must show, beyond all reasonable doubt, that plaintiff in error was at the scene of the crime at the time Smith was killed before he could be held responsible for the death, and that if the jury entertained a reasonable doubt on this point it should find him not guilty. These instructions covered all that part of the refused instructions which was proper to be given.

During the course of the arguments one of the attorneys for the People, preliminary to reading to the jury a decision of this court, stated to the jury that one convicted of crime had the right to a review in the Supreme Court. Objection was made to the remark and the court overruled the objection, stating that the statement was merely preliminary to

reading the decision and that it had no reference to plaintiff in error.   Objection was made to the prosecuting attorney reading the facts in *People* v. *Delorenzo,* 300 Ill. 124, but this objection was overruled.   It is proper to read to the jury decisions of the Supreme Court of this State where they are in point.   When counsel desires to read to the jury from reported cases it would facilitate matters for him to submit the cases to the court, so that the court will have an opportunity to designate the portions that may be read. Great care should be exercised in making the selection, so that irrelevant matter will not be injected into the case and the jury thereby confused.   The jury is the judge of the law and attorneys have the right to argue law to it, but the trial court is not obliged to allow the reading of numerous authorities to the jury or the unnecessary consumption of the public time in discussing such authorities.   The court has a clear right to keep the reading of law to the jury within reasonable limits.   (*People* v. *Lloyd,* 304 Ill. 23.) The *Delorenzo case* is not similar to the case here under consideration and the opinion should not have been read to the jury.   There is nothing in the abstract to show that it was read, and so nothing is presented on this point for us to review.

During the closing argument for the People the prosecuting attorney denounced plaintiff in error as a thief and a gun-man, and objection is made to his remarks on the ground that they prejudiced the rights of plaintiff in error. Arguments and statements of counsel based upon the facts appearing in the proof, or upon legitimate inference deducible therefrom, do not transcend the bounds of legitimate debate and are not to be discountenanced by the courts. It is not improper for the prosecuting attorney to reflect unfavorably on the defendant and to denounce his wickedness, and even indulge in invective within the limits of propriety, if based on evidence competent and pertinent to be

decided by the jury. *People* v. *Lloyd, supra; Crocker* v. *People,* 213 Ill. 287.

Objection is also made to the conduct of the jury and of those in charge of the jury, and of the State's attorney in the presence of the jury. It is charged that the jury was permitted to separate, that a newspaper containing an account of the trial was found in the jury room immediately after the jury left the room for supper, and that the State's attorney read a newspaper in the court room in the presence of the jury, the newspaper having on it headlines referring to the case. We fail to find anything that justifies the conclusion that plaintiff in error was prejudiced. He does not point out in his argument when and under what circumstances the jury was allowed to separate, or that the jurors, or any of them, came in contact with the public, or that there was any conduct on the part of the jury that would justify a conclusion that anything occurred that influenced its verdict. There is nothing to show that any of the jurors read anything that was in the newspapers, or that there was anything in the papers that would have had a tendency to affect the verdict if they had read it.

We have given this record the careful examination which the solemnity and importance of the results which follow our decision demand, and we are convinced that plaintiff in error has had a fair and impartial trial and that the jury would not have been justified, under the evidence, in returning any other verdict. It is not the purpose of a reviewing court to determine whether a record is perfect, but its purpose is to determine whether accused has had a fair trial under the law and whether his conviction is based on evidence establishing his guilt beyond all reasonable doubt.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*