Filed 6/28/10

NO. 4-09-0180

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|      Plaintiff-Appellee, | ) | Circuit Court of |
|      v. | ) | Coles County |
| JASON A. ABERNATHY, | ) | No. 07CF473 |
|      Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Gary W. Jacobs, |
| | ) | Judge Presiding. |

_____

JUSTICE APPLETON delivered the opinion of the court:

In October 2007, the State charged defendant, Jason A. Abernathy, with aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2006)). After a December 2008 trial, a jury found him guilty as charged. In March 2009, the trial court sentenced defendant to 20 years in prison. Defendant appeals, claiming he is entitled to a new trial because of the admission of prejudicial other-crimes evidence or, alternatively, due to the lack of a contemporaneous limiting instruction. We affirm.

I. BACKGROUND

On October 24, 2007, the State charged defendant with aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2006)), alleging he knowingly caused great bodily harm to Gina Giberson by striking her in the head and causing her to lapse into a coma. This alleged battery occurred in the early morning hours, between 4 and 5 a.m., on October 16, 2007, at their shared residence. At approximately the same time, neighbors reported smelling smoke in the area. The fire department responded to a house fire at this same

residence at approximately 6 a.m. After investigating the scene, fire officials determined the cause of the fire was arson. (We note that in defendant's brief, he refers to a second fire that occurred less than 24 hours after the first fire, with the second fire reportedly destroying the home. For this fact, defendant cited to the assertions in his motion in limine discussed below. However, the evidence presented at trial made no reference to a second fire.)

Defendant filed a motion in limine to prevent at trial the admission of any evidence relating to the fire. He claimed, because he had not been charged with any criminal conduct relating to the fire, any evidence regarding the fire was irrelevant and inadmissible. Specifically, he claimed the prejudicial effect of the admission of any fire-related evidence far outweighed the probative value.

The State argued that it needed to present evidence of the fire in order to advance its theory that defendant started the fire with the intent to destroy evidence of the charged offense. Initially, the trial court denied defendant's motion but admonished the State that it should be prepared to present evidence linking defendant, or someone acting on his behalf, to setting the fires in an attempt to destroy the evidence. The State assured the court that it would indeed be able to connect defendant to the fires, "specifically with regard to timing and sequence of events." The court directed the following comment to defendant's counsel: "If you want to bring it back up to me before that evidence is presented, or if the State doesn't bring connecting evidence that shows to me there's [a] connection between these allegations, then I'll hear that." Later, the court changed its ruling and directed this comment to the prosecutor: "So I guess what we can do is this: Be prepared, Mr. Ferguson [State's Attorney], on the date I'm continuing these other motions,

-2-

I will continue this motion further to hear what the State intends to proffer regarding the use of testimony relating to fire or fires. Be prepared to tell me that. All right?"

At the next pretrial hearing, the trial court indicated that, at the last hearing, it had already denied defendant's motion in limine relating to the admission of evidence of the fire. The court stated: "I've denied it. I'll allow you [defense attorney] to renew it if you think there's a question of relevance, and that's basically the question argued that I was saying is whether or not there is some relevance to that evidence coming in." Neither party objected to the court's disposition.

After receiving additional discovery from the State, defendant filed a subsequent motion in limine to bar reference to the fire. During the State's argument in response to defendant's motion, the prosecutor stated: "The fact that there is--that he is not charged with arson isn't the, I guess, the lynchpin of being able to argue that evidence was destroyed, and that he had the motive, desire, the time, and the opportunity to do so." The trial court admonished the prosecutor as follows: "If you think you can tie it up, I am not going to handcuff you and not allow you to present that evidence as part of the case that is before the [c]ourt." The court asked the prosecutor to identify the substance of the connecting evidence. In response, the prosecutor provided the following explanation:

"Your Honor, we have--as the [c]ourt has indicated, we have the disturbance, the assault, or the self[-]defense if you want to call it, early in the morning of October 16.

He takes her out to the hospital, taking hours to get there. Purportedly running out of gas and calling his brother to bring gas.

-3-

We have a fire at the house in which an accelerant is found.

I am probably leaving something out, but that is--there is that connection. It gives--there is the--from our standpoint, the time, the opportunity, and the motive to destroy that house or destroy evidence that he believes may be in that house."

The court denied defendant's motion. Defendant announced he would be asserting self-defense as an affirmative defense.

Defendant's jury trial began on December 8, 2008, and continued for five days. Prior to the start of the trial, defendant again raised the issue of the admissibility of evidence relating to the fire, arguing it should be barred. The prosecutor stated: "I don't plan on making a big thing. Obviously, we will be bringing out that the accelerants were found." The trial court confirmed its previous ruling and determined that it would allow the State to introduce any relevant evidence that would advance its theory of the case. Defendant indicated, for the record, he was making a continuing objection to any reference to the fire.

The trial testimony in this case was extensive. Because defendant does not challenge the sufficiency of the evidence, we will summarize only that which is relevant to the issue presented in this appeal. The victim, Gina Giberson, testified that she had no recollection of the assault. She only remembered waking in the hospital with breathing and feeding tubes and being advised by the medical personnel that she required therapy to learn to walk again. She testified to two past incidents of domestic violence between her and defendant, both occurring a few months prior to the incident at issue. In the first incident,

she was seated in a chair when defendant picked up the chair and slammed her into the wall. In the second incident, she had jumped from a moving truck after defendant had threatened to kill her.

According to Giberson, immediately prior to the October 2007 incident, she had found methamphetamine in her car and assumed it was defendant's. She confronted defendant with her findings and demanded he move out of the residence. Because defendant had told investigators that Giberson was injured when she hit her head on a marble table, the prosecutor asked Giberson if she owned such tables. Giberson acknowledged that she did, but said the tables were kept either in the garage or in the basement, not in the living area of the home.

Coles County Deputy David Lewis testified that he had interviewed defendant at the hospital at approximately 7:40 a.m. on the day of the incident and defendant relayed his version of the domestic altercation. Defendant told Lewis that, as he approached the home, he saw a man running out the back door. When defendant went inside, Giberson began swinging a bat at him, hitting him in the hand. Defendant hit Giberson in the jaw, and she fell, hitting her head on a marble table. Lewis noted that defendant had cuts or marks on his left knuckle. Defendant further explained to Lewis that he had picked up Giberson and carried her to the car. However, he did not mention that he had dropped her in the process. He said he proceeded to the hospital but ran out of gasoline on the way. He called his brother, Marvin Abernathy, who delivered gasoline to him. Defendant told Lewis that Giberson's back may have been bruised during the transport, as she was wedged between the seats of the vehicle.

Jeff Craig, Giberson's neighbor and a close friend of defendant's, testified that

-5-

defendant had told him the night before the incident that Giberson had asked defendant to move out and he "'was tired of being kicked out.'" Craig also testified that his black baseball bat that was hanging near his workbench when he went to sleep on October 15, 2007, was missing the next day.

David Craig, a Charleston police officer, testified that he was dispatched to the house fire at 7 a.m. and then to the hospital to investigate the domestic-violence incident. He spoke with defendant, who told him about seeing a man leaving the home and Giberson swinging the bat at defendant when he came in. Defendant told Craig that he possibly had "hit her too hard." He thought he had killed her. Craig also noted that defendant's hand was red and swollen.

Kris Phipps, Charleston fire chief, testified that he received the report of the fire at approximately 6 a.m. The fire was under control in less than two hours. Phipps noticed "some red flags" and, therefore, requested the assistance of the Illinois State Fire Marshal's office. By 6:30 p.m., the fire investigation was complete. The investigators had noticed that an area just inside the front door was burned through the floor to the joists. Phipps testified: "We determined that it was an incendiary fire. It was not due to a natural cause." At the time of defendant's trial, no one had been charged with arson related to this fire.

Dr. Shane Cline, an emergency-room physician at Sara Bush Lincoln Hospital, testified to the extent of Giberson's injuries when she arrived shortly after 7 a.m. She had severe facial swelling and bruising. A computerized tomography (CT) scan revealed significant bleeding injuries to her brain. Dr. Cline spoke with defendant, who, according to Dr. Cline, told him he had assaulted Giberson with a baseball bat. Giberson was placed

on life support and transferred to Carle Clinic in Champaign, a level-one trauma center.

Dr. William Olivero, a neurosurgeon at Carle Clinic, testified that Giberson remained comatose and in critical condition for approximately one week. She had 10 to 15 bruises scattered on her brain. The injuries reflected that she had suffered multiple blows to her head. Dr. Olivero opined that these types of injuries would not have occurred from being dropped, unless she was dropped multiple times directly on her head. Dr. Olivero testified that Dr. Cline did not mention to him that Giberson had been assaulted with a baseball bat.

Michael Kyrouac, a sergeant and crime-scene investigator with the Illinois State Police, testified that he arrived at the scene of the fire at approximately 11:40 a.m. He took multiple photographs, which were published to the jury. Kyrouac noticed several stains that appeared to be blood throughout the house and in the driveway. He found evidence of a struggle in the bedroom, as a lamp was knocked over, lying on a nightstand next to pieces of a broken mirror. He also found a cigarette lighter under a burned chair in the living room. Kyrouac noted no forced entry into the home. He said he did not recall seeing any marble tables in the home. Kyrouac went to Carle Clinic and took photographs of Giberson's injuries, which were also published to the jury. On cross-examination, Kyrouac testified that, to his knowledge, nothing about the scene or items found therein were directly attributable to defendant.

Dwayne Morris, an Illinois State Police trooper and crime-scene investigator, testified that he executed search warrants on defendant's and Giberson's vehicles. He collected no evidence from defendant's truck but several pieces of evidence from Giberson's car. He found a green cloth with red stains in the front passenger seat, a piece of wood with

an unidentified stain and hair stuck on the end lying inside the driver's side door, and a baseball bat concealed under the carpeting in the trunk.

Ky Rardin, Jeff Craig's brother and roommate, testified that he recalled seeing defendant with Jeff at Rardin's home on the evening of October 16, 2007. The prosecutor showed Rardin the baseball bat that had been found in Giberson's trunk. Rardin testified that the bat looked a "little different" from his brother's bat. The prosecutor reminded Rardin that he had previously told police officers that he saw defendant with Craig's baseball bat in his hands. However, at trial, Rardin testified that he recalled telling police about the bat, but he was not sure if he actually saw defendant with the bat. Rardin said that after he had learned about Giberson's injuries, he checked Craig's room to see if the baseball bat was still there, but it was gone. On cross-examination, he testified that, actually, he did not check on the bat until he spoke with police in October 2008, a year after the incident. He also testified that on October 16, 2007, at the time he saw defendant with Craig, Rardin had consumed approximately 20 beers.

Three neighbors, Glenda Durbin, David Durbin, and Paul LeBeau, each testified that they left their respective homes for work in the early morning hours of October 16, 2007. Glenda left at approximately 4:15 a.m., David left at approximately 5:15 a.m., and LeBeau left at approximately 5:45 a.m. Each recalled smelling smoke, but it was a foggy morning and Giberson had a pit fire in her backyard the evening before, so they did not think much about the smell. They did not see flames coming from the home.

Shane Arndt, an arson investigator with the Illinois State Fire Marshal's office, was called to the fire scene at approximately 7:35 a.m. He and his canine partner, Sherlock, arrived at approximately 9:30 a.m. and investigated the scene to determine the cause and

origin of the fire. Sherlock was trained specifically to detect accelerants. During their initial walk-through, Sherlock alerted. Arndt ceased his investigation and spoke with the fire chief, who contacted the State's Attorney's office to obtain a search warrant. After they received the warrant, Arndt and the assistant fire chief entered the residence and took photographs of where Sherlock had alerted, as well as other areas of the home. Sherlock had alerted multiple times in the kitchen, dining room, and living room. Arndt collected samples from several of the alert areas and submitted them to the Illinois State Police crime lab. One of the items found was a blue washcloth with red stains and a "very strong" odor of gasoline. Arndt inspected a large hole in the living room floor and determined that was the origin of the fire. He classified the fire as incendiary, meaning "there had to be human involvement to intentionally set the fire."

On cross-examination, Arndt testified that he had collected a cigarette lighter from the scene and submitted it for testing. However, no fingerprints were found. Like Kyrouac, Arndt testified that the evidence recovered from the home could not "directly or indirectly [be] attributed to Mr. Abernathy."

Joanne Liu, a forensic scientist with the Illinois State Police crime lab, conducted a fire-debris analysis on the evidence submitted. She discovered the presence of gasoline on the blue washcloth, a piece of carpeting, and other debris.

Bradley Lebar, another forensic scientist with the Illinois State Police crime lab, conducted a fingerprint analysis on the baseball bat found in the trunk of Giberson's car and found one suitable fingerprint for comparison. It matched defendant's right middle finger.

Amanda Humke, also a forensic scientist with the Illinois State Police crime

lab, conducted biological analyses on the evidence submitted and found the presence of blood on (1) the gravel, (2) a swab from the floor in the home, (3) a pair of defendant's black denim jeans, (4) defendant's T-shirt, (5) a pair of defendant's boots, (6) the baseball bat, (7) the piece of wood found in the car, (8) a floor mat from the car, and (9) a denim jacket. Humke conducted a deoxyribonucleic acid (DNA) analysis of the swab from the floor, the T-shirt, two areas on the baseball bat, and the jacket. She found Giberson's DNA on each. From the baseball bat, Humke took one sample from the barrel portion of the bat and one from the handle portion. The sample from the barrel matched Giberson's DNA. The sample from the handle was smaller and contained a mixed profile. Humke could only ascertain that the measurable portion of that small sample was the DNA of a male subject. A match to defendant's profile was inconclusive, but defendant could not be excluded as the source.

Tina Torralba testified that she has two children with Giberson's son, Travis Howlett. On October 15, 2007, Torralba visited with defendant and his mother, Laurel Abernathy, at Laurel's home. At approximately 9 p.m., defendant left Laurel's home, leaving Torralba there, indicating he would return. He did not return. Torralba had left her backpack and cellular telephone in defendant's truck. Torralba testified that the telephone numbers for her father and stepmother, Orrick and Amy Cobble, were programmed into her cellular telephone and could possibly accidently be dialed with the touch of one button. The next morning, defendant's brother, Marvin Abernathy, woke Torralba and Laurel and told them Giberson and defendant had been hurt and they were at the hospital.

Orrick Cobble testified that he had known defendant and Marvin Abernathy "for a long time" and he would recognize their voices on the telephone. At approximately

-10-

5 a.m. on October 16, 2007, Amy Cobble's cellular telephone rang. The caller identification indicated that Torralba was calling. Orrick answered the telephone and heard "kind of a moaning" and a "ding, ding," as if a seat belt was not attached or a car door was open. He continued listening and heard defendant's voice, but it was muffled, as if the telephone was lying underneath something. He thought he heard defendant say: "Tina walk to Abby's." Cobble said Marvin Abernathy was known as "Abby." Cobble became very concerned that Torralba was injured. He later realized that defendant probably said "Gina," not "Tina." Nevertheless, he drove to Marvin Abernathy's home in Ashmore. Marvin's car was there, but no lights were on in the home. Cobble did not find anyone along the road, so he drove back home. When he arrived, the fire department was at Giberson's home. He drove to the hospital to see if anyone had been admitted for injuries. There, he met Torralba, Laurel Abernathy, and Marvin Abernathy.

By stipulation presented to the jury, the parties agreed that the following telephone calls were placed from Torralba's telephone on October 16, 2007: (1) at 4:53 a.m. to Eastern Illinois Railroad (Marvin Abernathy's cellular telephone) for one minute or less; (2) at 4:54 a.m. to Carrie Abernathy (Marvin Abernathy's wife) for one minute or less; (3) at 4:55 a.m. to Carrie Abernathy for one minute or less; and (4) at 5:06 a.m. to Amy or Orrick Cobble for seven minutes.

Zachary Bryan, a Charleston police officer, testified that he had interviewed Marvin Abernathy the day after the incident. Marvin assisted Bryan in locating defendant's truck, which was found parked in the backyard of the house of Marvin's friend. Bryan also interviewed Jeff Craig, who told the officer that when defendant left Craig's home, "'he was ready to hit something.'" Craig told Bryan that defendant was "'tired of being kicked out.'"

-11-

Charleston police detective James Blagg testified as the final witness for the State. On October 29, 2007, Blagg audiotaped an interview with Jeff Craig. The recording was played for the jury. During the interview, Blagg showed Craig the baseball bat recovered from the trunk of Giberson's vehicle. Craig identified the bat as his own but, he said, the rubber grip was missing. A year after the incident, in October 2008, Blagg recorded an interview with Ky Rardin. This recording was also played for the jury. Rardin told Blagg that, on October 16, 2007, at approximately 1 a.m., he saw defendant trying to wake Craig, who was sleeping. A few minutes later, Rardin saw defendant with Craig's baseball bat in his hands. Rardin went into his room and soon after, he heard the door close. He assumed defendant left.

Blagg testified that he had interviewed defendant on October 16, 2007, at the Charleston police department. Defendant's interview was audio and video recorded. The jury was given a transcript of the interview and allowed time to read it before the video recording was played. Defendant was under arrest at the time of the interview. He told Blagg that during the early morning hours (he did not know what time it was but knew it was dark) of October 16, 2007, he was approaching his house and saw a strange man "flying out [his] back door." He went inside and Giberson swung a baseball bat at defendant. He caught the bat with his left hand and punched her in the jaw with his right hand. He said he "may have hit her harder than [he] thought." Her "head twisted" and she fell. "[T]he jerk of the neck" knocked her unconscious. He put her in her vehicle, dropping her a few times because his hand hurt, and drove her to the hospital. The house "wasn't on fire when [they] left." He ran out of gasoline on the way. His brother, Marvin, brought him gasoline and they proceeded to the hospital. The State rested.

-12-

Defendant moved for a directed verdict on two grounds: (1) the evidence was insufficient to prove defendant guilty beyond a reasonable doubt; and (2) the jury had been "tainted" by the admission of evidence of the fire. The trial court denied defendant's motion on both grounds, finding as follows: "that [the fire] evidence [was] part of the entire history, if you will, of the case; and, to devoid those facts from the issues involving the aggravated domestic battery would put the People in a position of not being able to tell, if you will, their story of the events that surround the charge."

Defendant testified on his own behalf. He said he and Giberson had been dating for three years and planned to wed. Their relationship had never been violent. He accused Giberson of having a substance-abuse problem and claimed she became violent if she did not have drugs. He described several incidents in Giberson's past when she became violent with her sons and ex-husbands or boyfriends.

Directing his attention to the incident in October 2007, defendant testified that Giberson became angry at him on October 13, 2007. For the next several days, defendant avoided her by staying at his mother's home, with friends, or sleeping in his truck. On October 15, 2007, at approximately 4 p.m., defendant ate dinner at Travis Howlett's home with him and Torralba. Torralba asked defendant for a ride to her father's house, so defendant drove Torralba there. Defendant went to Jeff Craig's house but Craig was not home. As defendant drove from Craig's house, he saw Torralba walking, so he picked her up and took her to his mother's house. Defendant left Torralba at his mother's house and drove back to Craig's house. Defendant spent the next few hours traveling back and forth between Craig's home and defendant's friend and boss Scott Harrison's home. When defendant left Harrison's home, he discovered he had locked his keys in his truck.

He tried to retrieve his keys, but he shattered his driver's side window in the process. Defendant drove back to Craig's house at approximately 2 a.m. and played on Craig's computer, while Craig slept for two hours.

At approximately 4 a.m., defendant walked home (the residence he shared with Giberson) to retrieve a change of clothes. As he approached the home, he saw a man running out of the back door and down the alley. Defendant entered the home and saw Giberson. She turned and swung a baseball bat at defendant, hitting him in the hand. Defendant noticed that Giberson's eyes were red and glassy. She swung the bat at him a second time and he grabbed it. He punched her, knocking her unconscious. She "smacked her head onto the marble table on the way down." Defendant picked her up to carry her to the car, but he dropped her going down the steps. She hit her head on the concrete. He tried to get a better grip on her, which was difficult because of his injured hand. She fell again. He picked her up again and put her in the backseat of her car. He laid his denim jacket over her.

Defendant had Torralba's cellular telephone, so he called his brother, Marvin Abernathy. Marvin did not answer the first two calls. On defendant's third attempt, Marvin answered. Defendant said he was confused and started driving to Marvin's house instead of the hospital. Marvin directed him to drive to the hospital, so defendant turned around and began that way. Giberson fell from the backseat onto the floor. The car started sputtering and ran out of gasoline. At this point, defendant could not find Torralba's telephone. He stopped the vehicle, got out, and searched for the telephone. He found it, but the battery was dead. Defendant then heard his cellular telephone ring from inside of the glove box. It was Marvin. Defendant told Marvin he had run out of gas. Marvin

-14-

delivered the gasoline, and defendant proceeded to the hospital with Giberson. They arrived at approximately 7 a.m. Defendant denied telling Dr. Cline that he had hit Giberson with a baseball bat. At the close of his direct examination, defendant admitted he was convicted of unlawful possession of a weapon by a felon and unlawful possession of a controlled substance in 2001.

On cross-examination, defendant said he believed Giberson hit her head a total of four times during the incident. He acknowledged that he had placed the baseball bat in the car. Although he agreed that an aluminum bat would not burn in a fire, he denied that was the reason he put the bat in the car. The following exchange occurred:

"Q. The prints, the fingerprints of the person who was swinging the bat by holding onto the grip of the bat, those are gone, aren't they?

A. Only print they said they got was my print on the–

Q. Off the aluminum. That does not burn, true?

A. True.

Q. If there was foam or leather wrapped around there, some kind of tape, did you burn that back in the house?

A. No.

Q. You did go back in the house to make sure you could prove--get yourself out of trouble, right?

A. With the bat.

Q. You did go back inside that house a second time?

A. I put the bat in the car because she was swinging it at

-15-

me and holding from the handle. I figured if they could prove anything, they could show that she was swinging the bat at me.

Q. You had to go back a second time to take care of the evidence, didn't you?

A. I went and got the bat.

Q. A second time going back in?

* * *

THE COURT: Objection is overruled. Please answer the question.

Q. You left her moaning in the car dying. You went back--

A. Yeah, I went right back in and grabbed the bat.

Q. You never told any police officer, I can prove myself innocent. I got the evidence in the back of the car?

A. I didn't."

After defendant's testimony, the trial court read two stipulations to the jury. The first stipulation duplicated the previous stipulation regarding the telephone-call records placed on Torralba's telephone. However, the stipulation added the following statement: "No other calls were made or received from this phone until 11 p.m., almost 18 hours later." The second stipulation related to the treatment of defendant's hand and provided that, if called as a witness, Dr. Ruffalo would testify that an X ray performed on October 17, 2007, on defendant's left hand revealed a fracture of the fifth metacarpal. The second stipulation also provided that Giberson had pleaded guilty to domestic battery in

-16-

1997 for grabbing an ex-boyfriend by the hair and pulling him to the ground.

Christopher Allen Harrison, Giberson's ex-husband, testified on defendant's behalf. First, he acknowledged that he had been convicted in 2001 of aggravated battery to a police officer. He then testified to several violent altercations with Giberson, in which she was the aggressor.

At the close of Harrison's testimony, defendant rested. In rebuttal, the State called Garrett Howlett, Giberson's son, to testify that he lived with his mother, defendant, and his brother, Michael Howlett. He said a baseball bat was never kept in the house. On cross-examination, Howlett acknowledged that he had "a lot of [criminal] charges," but he was unable to confirm any specifics related thereto.

The State also called Pat Goodwin, the assistant fire chief for the City of Charleston, who testified that the only furniture moved in or from the residence was a dresser "moved out a little bit" from the wall in the dining room and the couch from the living room. No marble tables were found or moved. On cross-examination, Goodwin testified that, to his knowledge, no one had been charged with any crime related to the fire. The State rested.

During the State's closing argument, the prosecutor argued that defendant started the fire at the house in order to destroy evidence of the domestic battery. The prosecutor claimed defendant intended to destroy the grip from the baseball bat and all of the items in the house that had Giberson's blood on them. According to the prosecutor, defendant knew the bat would not burn, so he removed it from the home and concealed it in the trunk of the car.

Defendant's counsel argued that the State had failed to present any evidence

that would connect defendant with the fire. Counsel reminded the jury that no one had been charged with any crime related to the fire.

After closing arguments, the trial court instructed the jury. The instructions included Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000), a limiting instruction relating to evidence of uncharged conduct. After deliberations, the jury found defendant guilty of aggravated domestic battery.

On March 4, 2009, the trial court considered defendant's posttrial motion in which he alleged, inter alia, that he was entitled to a new trial due to the admission of evidence relating to the fire. He claimed such evidence was prejudicial and outweighed any probative value. After considering the arguments of counsel, the court denied defendant's motion and proceeded to sentencing. The court considered evidence in aggravation and mitigation, defendant's presentence investigation report, the statutory factors in aggravation, and recommendations of counsel. Based on defendant's prior criminal history, the court was required to sentence defendant on his Class 2 felony as a Class X offender. See 730 ILCS 5/5-5-3(c)(8) (West 2006). The court sentenced defendant to 20 years in prison. The court subsequently denied defendant's motion to reconsider his sentence as excessive. This appeal followed.

II. ANALYSIS

In this direct appeal, defendant does not challenge the sufficiency of the evidence related to his aggravated-domestic-battery conviction. Instead, he claims he was denied a fair trial due to the admission of evidence that implied he was responsible for setting the fire. In the alternative, he argues the trial court erred in failing to give a limiting instruction at the time the other-crimes evidence related to the fire was presented to the

-18-

jury. We disagree with defendant's claims.

The State first contends defendant has forfeited review of these issues by admitting, during the hearing on his motion in limine, that the evidence that a fire had occurred at the home was admissible. The State claims defendant cannot assert in the trial court proceedings that such evidence was admissible, and then later, in his appeal, claim it was not. Indeed, defendant's counsel admitted to the trial court that the State should not be precluded from presenting evidence that a fire occurred. However, the State misconstrued defendant's counsel's admission.

The admissibility of evidence that a fire occurred is not the issue raised by defendant in this appeal. Nor was it the subject of defendant's motion in limine. Rather, defendant claims that the introduction of any evidence tending to prove that he was responsible for setting the fire in order to destroy evidence of the domestic battery was inadmissible. Defendant claims that, by allowing the admission of such evidence, the State attempted to persuade the jury to draw an impermissible inference that, since defendant started the fire, he must have committed the domestic battery. In other words, the issue of admissibility raised in this appeal is not the same issue of admissibility that was discussed in the trial court when defendant's counsel had agreed that certain fire evidence would be admissible. For that reason, defendant's claim has not been forfeited for the purposes of this appeal. Cf. People v. Woods, 214 Ill. 2d 455, 475, 828 N.E.2d 247, 259 (2005) (a defendant forfeits review of the propriety of the admission of evidence if he acquiesced in the admission of that evidence at trial).

A. Admissibility of Other-Crimes Evidence

As a general rule, evidence that is relevant is admissible. People v. Monroe,

66 Ill. 2d 317, 321, 362 N.E.2d 295, 296 (1977). Whereas, irrelevant evidence is inadmissible. People v. Chambers, 179 Ill. App. 3d 565, 576, 534 N.E.2d 554, 560 (1989). " ' "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " Monroe, 66 Ill. 2d at 322, 362 N.E.2d at 297, quoting Fed. R. Evid. 401. We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. People v. Ward, 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702 (1984).

Evidence of another crime is admissible if it is relevant for any reason other than to show the defendant's propensity to commit crime. People v. Thompson, 359 Ill. App. 3d 947, 951, 835 N.E.2d 933, 936 (2005). While evidence of extra-indictment offenses is generally inadmissible, such evidence can be received where it goes to show motive, intent, identity, absence of mistake, or modus operandi. People v. McDonald, 62 Ill. 2d 448, 455, 343 N.E.2d 489, 492-93 (1975). Evidence of other crimes may also be admitted as part of a continuing narrative of the events in question (Thompson, 359 Ill. App. 3d at 951, 835 N.E.2d at 936) or as evidence to show a consciousness of guilt (People v. Smith, 3 Ill. App. 3d 958, 960, 279 N.E.2d 512, 513 (1972)).

However, even if the evidence is sought to be introduced for one of the permissible reasons, other-crimes evidence may be excluded if the trial court determines, after conducting a balancing test, that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. Thompson, 359 Ill. App. 3d at 951, 835 N.E.2d at 936. This balancing test is the subject of defendant's appeal. He contends the trial court failed to conduct the balancing test and to consider whether the

prejudicial effect of the admission of the evidence related to the cause and timing of the fire and defendant's potential motive for starting the fire outweighed the probative value of such evidence.

We note that in ruling on defendant's motion to exclude such evidence, the court did not specifically state that it had engaged in the required balancing test. However, the record makes clear that the court did so. Defendant argued he would be prejudiced by the introduction of the evidence. In response, the court noted that it was going to require the State to present the specific evidence that it intended to introduce at trial in order for the court to "weigh that against what prejudicial effect it might have upon the defendant." In its ruling, the court limited the State to introducing only relevant and closely related evidence. The court did not give the State unbridled discretion. Despite the court's failure to specifically articulate that it engaged in the balancing process, we find no error. See People v. Davis, 319 Ill. App. 3d 572, 575, 746 N.E.2d 758, 761 (2001) (the record demonstrated that the trial judge weighed the danger of unfair prejudice against the probative value even though the judge did not specifically articulate it). Finding that the court did implicitly engage in a balancing analysis, we must determine whether the result of the court's analysis was correct. In other words, we must decide whether the probative value of the other-crimes evidence outweighed the danger of unfair prejudice.

The State presented the following theory of the case: On October 16, 2007, defendant entered the home around 4 a.m. and confronted Giberson, while armed with Craig's baseball bat, about getting kicked out of the home. Defendant was disgruntled and frustrated with the situation. He repeatedly beat Giberson with the bat about her head and body. Defendant placed her in the vehicle to take her to the emergency room. He went back

in the house, removed the grip from the bat, and started a fire in the home to destroy evidence of the altercation. He hid the bat in the trunk and left the home.

To support this theory, the State presented evidence from neighbors who recalled smelling smoke as early as 4:15 a.m. The State also presented testimony from the fire investigators, who had photographs of the fire damage and who had determined that the cause of the fire was arson. Police investigators at the scene of the fire noted no evidence suggested forced entry into the home. They also noted signs of a struggle at the home, finding a broken mirror in the bedroom and blood throughout the house and in the driveway. In particular, a blue washcloth found in the home had the presence of both blood and gasoline. The forensic scientists, who had conducted a fingerprint analysis on the bat, determined that no discernible or conclusive prints were found on the handle portion of the bat, which did not contain any type of a grip. Jeff Craig identified the bat as his and testified that the grip from the handle portion of the bat was missing. A forensic scientist also testified that Giberson's DNA was found on the barrel portion of the bat. Defendant testified that he had requested the delivery of gasoline from his brother and was thus in possession of the same accelerant found in the home. The bat was recovered, concealed under the carpeting in the trunk of the vehicle.

In this case, the probative value of the other-crimes evidence related to the fire could potentially satisfy the following two exceptions to the rule that other-crimes evidence is generally inadmissible: the continuing-narrative exception and the consciousness-of-guilt exception. We will examine the principles of each.

1. Continuing-Narrative Exception

This court has specifically held that other-crimes evidence is admissible "if it

is part of a continuing narrative of the event giving rise to the offense or, in other words, intertwined with the offense charged." Thompson, 359 Ill. App. 3d at 951, 835 N.E.2d at 936. " 'When facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes.' " Thompson, 359 Ill. App. 3d at 951, 835 N.E.2d at 936, quoting People v. Collette, 217 Ill. App. 3d 465, 472, 577 N.E.2d 550, 555 (1991). " 'It has uniformly been held that evidence concerning acts which are closely and inextricably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances is admissible. [Citation.]' " Chambers, 179 Ill. App. 3d at 583, 534 N.E.2d at 564, quoting People v. Olivas, 41 Ill. App. 3d 146, 150, 354 N.E.2d 424, 428 (1976). This court has referred to this exception as "the continuing-narrative exception" to the general rule of the inadmissibility of other-crimes evidence. People v. Carter, 362 Ill. App. 3d 1180, 1191, 841 N.E.2d 1052, 1061 (2005).

Based on the State's evidence presented at trial, it was apparent that the fire at the home, the same home where the domestic battery occurred just minutes before, was not a separate and distinct crime but, rather, was arguably but one occurrence in a continuing narrative of the circumstances surrounding the domestic-violence incident. Cf. People v. Lindgren, 79 Ill. 2d 129, 139-40, 402 N.E.2d 238, 243 (1980) (evidence of arson should not have been admitted during the defendant's trial on armed robbery and murder when that act was totally unrelated to the crimes charged).

In Lindgren, a jury convicted the defendant of robbery, armed robbery, and murder. Lindgren, 79 Ill. 2d at 132, 402 N.E.2d at 240. The evidence at trial established that the defendant had traveled to his girlfriend's grandfather's home and murdered him.

-23-

He then drove to where his girlfriend was staying and took her to the scene of the murder, hoping that she could find her grandfather's money in the home. After they left the victim's home, the defendant stopped at his ex-wife's home and started a fire inside. Lindgren, 79 Ill. 2d at 134, 402 N.E.2d at 241. The supreme court held that the trial court had erred in admitting evidence that the defendant had committed an arson after the murder and armed robbery. The court held the arson evidence was not admissible as part of a continuing narrative of crime, as the arson "was a distinct crime undertaken for different reasons at a different place at a separate time." Lindgren, 79 Ill. 2d at 139-40, 402 N.E.2d at 243.

The Lindgren court distinguished its decision from that of People v. Marose, 10 Ill. 2d 340, 139 N.E.2d 735 (1957), a case more applicable to the facts presented here. In Marose, the defendant was convicted of rape, a crime which occurred in a stolen vehicle. The defendant complained that the introduction of evidence related to the allegation that the vehicle was stolen was inadmissible other-crimes evidence. Marose, 10 Ill. 2d at 341, 139 N.E.2d at 735-36. The court held as follows: "The facts concerning the stolen car and other sexual acts are all a part of the continuing narrative which concern the circumstances attending the entire transaction and they do not concern separate, distinct and disconnected crimes. No error was therefore committed by the trial court in this regard." Marose, 10 Ill. 2d at 343 , 139 N.E.2d at 736.

Like the facts set forth in Marose, the domestic battery occurred at the same location as the fire. Further, evidence of the domestic battery was found in the home that had been partially destroyed by fire, which had apparently started within minutes after the battery. Additionally, two of the police investigators assigned to investigate the domestic battery began their investigation at the scene of the fire. Thus, we find the evidence of the

fire was part of a continuing narrative of the entire transaction and was admissible for that purpose.

## 2. Consciousness of Guilt

Next, we analyze the admission of the fire evidence as other-crimes evidence related to defendant's consciousness of guilt. The supreme court's decision in People v. Spaulding, 309 Ill. 292, 304, 141 N.E. 196, 201 (1923), has some applicability to the instant appeal. In Spaulding, the defendant was charged with murder. During his trial, the State presented circumstantial evidence that he had killed an eyewitness to the murder and concealed his body. See Spaulding, 309 Ill. at 301-04, 141 N.E. at 200-01 . The supreme court noted "where the motive for the crime charged is the concealment of some other crime, either by destroying the evidence of such other crime or by killing a witness who could testify relative to it, the evidence of such motive is admissible even if it does show the commission of an extraneous crime." Spaulding, 309 Ill. at 304, 141 N.E. at 201. "Evidence that the accused has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt." Spaulding, 309 Ill. at 306, 141 N.E. at 202.

The State was entitled to present evidence to advance its theory that defendant started a fire with the intent to destroy the evidence of the domestic battery. Such evidence was admissible for the purpose of showing defendant's consciousness of guilt. The State attempted to prove defendant's consciousness of guilt through the introduction of circumstantial evidence, hoping the jury would infer that defendant removed the grip from the bat and started a fire in the house to destroy the evidence. "Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." People

v. Saxon, 374 Ill. App. 3d 409, 417, 871 N.E.2d 244, 251 (2007).

In Smith, this court held the introduction of other-crimes evidence was admissible to demonstrate the defendant's consciousness of guilt. Smith, 3 Ill. App. 3d at 962, 279 N.E.2d at 514. The defendant was convicted of aggravated battery against his wife. Smith, 3 Ill. App. 3d at 959, 279 N.E.2d at 513. He was indicted five months after the incident. Smith, 3 Ill. App. 3d at 959, 279 N.E.2d at 513. The State presented circumstantial evidence at the defendant's trial that, two days after he was indicted, he attempted to intimidate his wife, the complaining witness. Smith, 3 Ill. App. 3d at 959, 279 N.E.2d at 513. The State presented evidence that there was a "scuffle over an ax" between them, with the wife testifying that her son " 'got to [the defendant] and talked him out of it.' " Smith, 3 Ill. App. 3d at 959, 279 N.E.2d at 513. The defendant argued that the evidence of this struggle with the ax constituted inadmissible other-crimes evidence. Smith, 3 Ill. App. 3d at 959-60, 279 N.E.2d at 513.

With regard to the presentation of this evidence, this court noted as follows:

"If for the sake of argument we construe the 'scuffling' with the ax at the very least to be an intimidation of the complaining witness and at the very most an attempt to remove her as a witness, such conduct is indeed evidence then of consciousness of guilt from which an inference can be drawn that the defendant is guilty of the offense charged. Consciousness of guilt is very potent evidence of just that, and 'nothing but an hallucination or a most extraordinary mistake will otherwise explain its presence.' (II Wigmore on Evidence 106, section 273(1).) Of course, if the conduct sought to be admitted bears no relationship to the offense charged it would

be the duty of the court to reject such evidence, but not otherwise. Specifically here, if it can be said, and we think it can, that defendant's conduct was an attempt at the very least to suppress evidence by intimidation, then a very clear inference can be drawn that defendant was conscious that he was guilty of the offense charged." Smith, 3 Ill. App. 3d at 960, 279 N.E.2d at 513.

Similar to this court's holding in People v. Begay, 377 Ill. App. 3d 417, 879 N.E.2d 962 (2007), we conclude that the evidence related to the fire in this case did not, in fact, constitute inadmissible other-crimes evidence, but rather constituted circumstantial evidence relevant and probative to the issue of defendant's consciousness of guilt by destroying evidence of the charged offense. See Begay, 377 Ill. App. 3d at 421-22, 879 N.E.2d at 967 (this court held the testimony of a witness, the victim's son, that he heard a "splatter" outside moments before the defendant appeared at the victim's front door, and saw that the victim's car had been egged, was admissible as circumstantial evidence of the defendant's intent and state of mind at the time she appeared at the victim's apartment and engaged in the conduct that resulted in the charge of aggravated battery); see also People v. Jones, 269 Ill. App. 3d 797, 803-04, 635 N.E.2d 961, 966-67 (1994) (the evidence that the defendant was in possession of weapons was not other-crimes evidence, but relevant circumstantial evidence of the defendant's intent to deliver a controlled substance, the charged offense).

Pursuant to the State's theory of the case, defendant certainly knew that his fingerprints would be found on the grip of the bat. If those fingerprints were found, then his explanation of how the battery occurred would prove to be false. Thus, in order to ensure that his theory of self-defense would be believable, he had to destroy the grip of the

bat and any other evidence that could potentially contradict his version of the confrontation. To accomplish this, he used the gasoline that his brother had delivered to him and started a fire in the house to destroy evidence. "[T]here were sufficient facts and inferences as such for the admission of the incident as evidence of an attempt to [destroy evidence]. Whether anyone actually believed this to be true, is beside the point--and an argument against its admission being reversible error in all events." Smith, 3 Ill. App. 3d at 962, 279 N.E.2d at 514.

In sum, the circumstantial evidence presented by the State that defendant was responsible for setting the fire to the house was admissible other-crimes evidence for the purpose of either (1) describing the chain of events that occurred the morning of, and at the same location as, the charged crime, or (2) demonstrating that defendant attempted to destroy evidence as an expression of his consciousness of guilt. We find no error in the trial court's decision to admit the evidence related to the cause, timing, and location of the incendiary fire at the victim's home.

### B. Limiting Instruction

Defendant also contends that, although a limiting instruction was presented to the jury prior to deliberations, the trial court failed to give the jury a limiting instruction when the other-crimes evidence was presented during the trial. He claims this error deprived him of a fair trial. Citing this court's decision in People v. Denny, 241 Ill. App. 3d 345, 360, 608 N.E.2d 1313, 1323 (1993), defendant claims the court could have "lessened the impact of the evidence of other crimes" if it would have properly instructed the jury in the midst of trial when the evidence was first presented, as this court has previously recommended.

The supreme court approvingly cited Denny, and also encouraged trial courts to instruct the jury of the limited purpose of other-crimes evidence not only at the close of the case, but at the time the other-crimes evidence is admitted. People v. Heard, 187 Ill. 2d 36, 60-61, 718 N.E.2d 58, 72 (1999). The court noted that, although the "better practice" was to instruct the jury contemporaneously with the introduction of evidence and again at the close of the trial, it held that a court's failure to do so does not mandate reversal. Heard, 187 Ill. 2d at 60-61, 718 N.E.2d at 72 (the supreme court did not agree with counsel's claim that the trial court must give a limiting instruction at the time the evidence is presented even if a proper instruction is given at the close of the case).

In this case, after closing arguments, the trial court instructed the jury that the evidence relating to defendant's involvement in conduct other than that charged could be considered only for the purpose of determining defendant's motive and knowledge. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000). "Thus, while the better practice is to give a limiting instruction when the other-crimes evidence is presented ***, the court's failure to give such an instruction does not warrant reversal." Carter, 362 Ill. App. 3d at 1193, 841 N.E.2d at 1062.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

Affirmed.

KNECHT and McCULLOUGH, JJ., concur.

-29-